**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SCOTTSDALE INSURANCE COMPANY,

Plaintiff,

vs.

CHICAGO SCAFFOLDING, INC., AAA-1 MASONRY & TUCKPOINTING, INC., and EMIL PIEKUTOWSKI,

Defendants.

Case No.: 14 cv 04268
Honorable Judge: Joan Humphrey Lefkow
Magistrate Judge: Sidney I. Schenkier

**PLAINTIFF'S MOTION FOR JUDGMENT AGAINST DEFAULTED DEFENDANT AAA-1 MASONRY & TUCKPOINTING, INC.**

Plaintiff, SCOTTSDALE INSURANCE COMPANY ("Scottsdale"), by and through its attorneys, Goldberg Segalla LLP, submits the following motion for judgment against defaulted defendant AAA-1 Masonry & Tuckpointing, Inc.

Introduction and Procedural History

Scottsdale seeks a judicial declaration that it has no duty to indemnify AAA-1 Masonry & Tuckpointing, Inc. ("AAA-1") for any obligation that AAA-1 allegedly owes to Chicago Scaffolding, Inc. ("CSI") to defend and/or indemnify it in connection with the lawsuit pending in the Circuit Court of Cook County, Illinois, encaptioned *Piekutowski v. AAA-1 Masonry & Tuckpointing et al.,* No. 2013 L 10341 ("Underlying Lawsuit"). This declaratory judgment action arises out of an alleged construction site incident where the underlying plaintiff, Emil Piekutowski, was struck by falling scaffolding.

On September 4, 2014, Scottsdale filed its Motion For Entry Of Order Of Default Against AAA-1 Masonry & Tuckpointing, Inc., which this Court granted by Order dated September 16, 2014. *See* Dkt. Nos. 21 and 23.

This Court should now enter judgment against AAA-1 because Scottsdale cannot be obligated to indemnify AAA-1 for any contractual liability it may have to CSI with respect to the Underlying Lawsuit. The indemnity provisions in the subject Swing Stage Scaffold rental contract between AAA-1 and CSI, which are the sole source of AAA-1's purported indemnity obligation to CSI, are void and unenforceable pursuant to the Illinois Construction Contract Indemnification for Negligence Act (740 ILCS 35/1 *et seq.*) ("Act"). Thus, any contractual liability coverage under the commercial general liability policy Scottsdale issued to AAA-1, No. BCS0023761, effective from December 31, 2010 to December 31, 2011 ("Policy"), does not apply here.

<u>AAA-1/CSI Rental Contract</u>

AAA-1 and CSI entered into a contract ("Agreement") for the rental of a Swing Stage Scaffold by AAA-1, as lessee, from CSI, as lessor. *See* Dkt. No. 1, Exhibit #3. The 2011 Credit Policy, General Usage and Terms & Conditions part of the Agreement contains indemnification provisions which state, in relevant part, as follows:

> **5. Disclaimer of Warranties and Indemnification By Lessee/Purchaser.** ... [AAA-1] agrees to indemnify and hold [CSI] free and harmless ... from any and all liability caused or alleged to be caused directly or indirectly by the leased/purchased Equipment, by any inadequacy thereof, or defect therein, or by any incident in connection therewith.
>
> * * *
>
> **15. Indemnification.** [AAA-1] shall indemnify and defend [CSI] against and hold [CSI] harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, including attorney's fees which:
>
> **(1)** Relate to injury or destruction of property, or bodily injury, illness, sickness, disease or death of any person including employees of [AAA-1] and:
>
> **(2)** Are caused or claimed to be caused, in whole or in part by the Equipment leased herein or by the liability or conduct (including active, passive, primary or secondary) of [CSI], its agents or employees, or anyone for whose acts of them may be liable. The parties agree that [CSI] shall only be liable or responsible for actions of willful misconduct.

    (3) [AAA-1] shall, at its own cost and expense, defend [CSI] against all suits or proceedings commenced by anyone in which [CSI] is a named party for which [CSI] is alleged to be liable or responsible as a result of or arising out of the Equipment, or any alleged act and/or settlement, judgment or other resolution, in the event that such action is commenced naming [CSI] as a party, [CSI] may elect to defend on its own behalf and [AAA-1] agrees that it shall be liable for all costs, expenses and attorney's fees incurred by [CSI] in such defense.

* * *

The Swing Stage/Hanging Platforms General Conditions for Sale, Lease or Work Performed part of the Agreement contains another indemnification provision which states, in relevant part, as follows:

> Liability for injury, disability and death of workmen and other persons caused by operation, handling or transportation shall be assumed by [AAA-1] and [AAA-1] shall indemnify, hold harmless and Name as Additional Insured to [AAA-1's] Liability Policy, [CSI]. [AAA-1] shall also indemnify [CSI] against all losses, damages, expense and penalties arising from any action on account of damage to property occasioned by the operation, handling or transportation of any equipment.

The Terms and Conditions part of the Agreement contains another indemnification provision which states, in relevant part, as follows:

> [CSI] shall have no responsibility, direction or control over the manner of erection, maintenance, use or operation of said equipment by [CSI]. [AAA-1] assumes all responsibility for claims asserted by any person [whatsoever] growing out of the erection, and maintenance, use or possession of said equipment and agrees to hold [CSI] harmless from all such claims.

## SCOTTSDALE POLICY PROVISIONS

The Policy, a copy of which is attached as Exhibit A to Scottsdale's Complaint for Declaratory Judgment (*see* Dkt. No. 1), contains the following relevant exclusion:

**2. Exclusions**

This insurance does not apply to:

* * *

### b. Contractual Liability

> "Bodily injury" … for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> * * *
>
> (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" … occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" … provided:
>
> (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract" …

The Policy as amended by Amendment of Insured Contract Definition Endorsement defines "insured contract" as "[t]hat part of any other contract or agreement pertaining to your business … under which you assume the tort liability of another party to pay for "bodily injury" … [t]ort liability means a liability that would be imposed by law in the absence of any contract or agreement."

## LEGAL AUTHORITY IN SUPPORT OF NO DUTY TO INDEMNIFY AAA-1 UNDER SCOTTSDALE POLICY

The broad, all-encompassing indemnification provisions of the Agreement are void as against public policy because they seek to shift all liability for CSI's own negligence to AAA-1. Accordingly, Scottsdale cannot be required to indemnify AAA-1 for an unenforceable obligation to CSI. Therefore, AAA-1 has no rights to coverage under the Policy in connection with any tort liability it attempted to assume in the Agreement. Also, given its failure to file an appearance or otherwise participate in this declaratory judgment action, AAA-1 has no rights to contest or challenge any judgment entered by this Court regarding Scottsdale's duties and obligations to CSI.

Standard for Evaluating a Motion for Judgment Against Defaulted Defendants in the Context of a Declaratory Judgment Action Seeking a Finding of No Coverage

For purposes of whether to enter a default judgment, well-pleaded allegations of a complaint are considered admitted by a defendant when that defendant is held in default for failure to answer the complaint. *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). A court is vested with the power and authority to enter declaratory default judgments. *Nautilus Ins. Co. v. Front Range Env'tl, LLC*, 14 CV 50083, 2014 U.S. Dist. LEXIS 124135 at *4 (N.D. Ill. Aug. 6, 2014), citing *Tygris Asset Fin., Inc. v. Szollas*, No. 09 C 4488, 2010 U.S. Dist. LEXIS 56491 at *6 (N.D. Ill. Jun. 7, 2010), and *Owners Ins. Co. v. Complete Mech. Servs., Inc.*, No. C 4201, 2008 U.S. Dist. LEXIS 88753 at *1-2 (N.D. Ill. Oct. 31, 2008) (copies attached).

Canons of Contract Interpretation

The primary objective in construing the language of a contract, such as an insurance policy, is to ascertain and give effect to the intentions of the parties as expressed by their agreement. *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 819 (7th Cir. 2008). Like any contract, an insurance policy is construed as a whole, giving meaning to every provision because "every provision was intended to serve a purpose." *Cent. Ill. Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 821 N.E.2d 206 (2004).

Issues of contract construction, as well as determinations of whether a contract contravenes public policy, are questions of law that are readily susceptible to early judicial resolution by motion. *See Liccardi v. Stolt Terminals (Chi.), Inc.*, 283 Ill. App. 3d 141, 147, 669 N.E.2d 1192 (1st Dist. 1996).

Illinois Construction Contract Indemnification for Negligence Act Voids the Indemnification Provision of the Agreement

**The Act Voids Indemnity Provisions in Construction Contracts Requiring the Indemnitor To Indemnify the Indemnitee for the Indemnitee's Own Negligence**

At all relevant times, there existed the Illinois Construction Contract Indemnification for Negligence Act, 740 ILCS 35/1 *et. seq.*, which provides, in relevant part, as follows:

> With respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, … or other work dealing with construction … every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable.

The Act is intended to ensure that a party with control over construction work has a continuing incentive to exercise due care and avoid construction-related injuries. *See Ill. Power Co. v. Duke Eng'g & Servs., Inc.*, 2002 U.S. Dist. LEXIS 5497, at *11-12, 14-15 (N.D. Ill. Mar. 29, 2002) citing *Lovellette v. S. Ry. Co.*, 898 F.2d 1286 (7th Cir. 1990) (copy attached); *see also Thompson v. Pizza Hut of Am., Inc.*, No. 89 C 6496, 1992 U.S. Dist. LEXIS 8701 (N.D. Ill. Jun. 18, 1992) (the language of the Act is broad and should be construed liberally) (copy attached).

**The AAA-1/CSI Agreement for the Rental of the Swing Stage Scaffold Is a Construction Contract Under the Act**

Whether the Act applies to void the indemnification provisions in the Agreement depends first on whether the Agreement is a contract "for the construction, alteration, repair or maintenance of a building, structure, … or other work dealing with construction." There can be no dispute that it is one, as the Agreement is for the rental of equipment to be used in the construction, alteration, repair, or maintenance of a building. Notably, the Illinois Appellate Court's conclusion in *Folkers v. Drott Manufacturing Co.*, 152 Ill. App. 3d 58, 504 N.E.2d 132 (1st Dist. 1987), that a crane rental agreement constituted a construction contract under the Act, is instructive here. *Id.* at 67; *see also Camper v. Burnside Constr. Co.*, 2013 IL App (1st) 121589, at *58, 998 N.E.2d 1264 (concluding that the conduct of the indemnitee, by "manufactur[ing] and deliver[ing] a manhole by unloading it from a struck and setting it on the ground at the construction," fell within the scope of the Act; thus, the indemnification clause of the purchase order agreement was void as against public policy).

Most telling of the purpose of the Agreement is the "Rental Contract" part, which references the subject construction project by address (referring to it as a "jobsite") and describes the services to be provided by CSI for the construction project, *i.e.*, provide the "installation, teardown, and the

rental of 2) 20' Rolling … of heavy-duty sidewalk protection canopy and 30 Stage at the above jobsite." Further, it is alleged in the Underlying Lawsuit that Mr. Pickutowski was injured while working on a construction project. The Underlying Lawsuit also alleges that AAA-1 and CSI's negligent operation, placement, erection, provision, securing, and/or construction of the Swing Stage Scaffold, which was being used in furtherance of the construction project, was the cause of Pickutowski's injuries. Taking together the Agreement and the allegations in the Underlying Lawsuit, the connection between the Swing Stage Scaffold and the construction project is manifestly obvious such that the Agreement must be considered "for the construction, alteration, repair or maintenance of a building" or "other work dealing with construction."

**The AAA-1/CSI Agreement Requires AAA-1 To Indemnify CSI for CSI's Own Negligence**

Whether the Act applies to void the indemnification provisions in the Agreement depends also on whether the Agreement requires AAA-1 to indemnify CSI for CSI's own negligence with respect to the Swing Stage Scaffold. The sweeping language of the Agreement establishes unequivocally that AAA-1 must indemnify CSI for CSI's own negligence. Notably, whether CSI is responsible for its "willful misconduct" is immaterial to this question because the Act concerns only the shifting of liability with respect to a party's **negligence**, *i.e.*, as long as the indemnitor must indemnify the indemnitee for the indemnitee's own negligence, the Act is triggered, and the indemnification provisions are a nullity.

The clearest illustration of the Agreement requiring AAA-1 to indemnify CSI for CSI's own negligence is sub-paragraph 15(2) of the 2011 Credit Policy, General Usage and Terms & Conditions part of the Agreement. That provision states that "[AAA-1] shall indemnify and defend [CSI] against and hold CSI harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities … which [a]re caused or claimed to be caused, in whole or in part by the Equipment leased herein or by the liability or conduct (including active, passive, primary or

secondary) of [CSI], its agents or employees, or anyone for whose acts of them may be liable." Additionally, the Terms and Conditions part of the Agreement states that AAA-1 is responsible for holding CSI harmless from all claims resulting from anything to do with the Swing Stage Scaffold: "[AAA-1] assumes all responsibility for claims asserted by any person [whatsoever] growing out of the erection, and maintenance, use or possession of said equipment and agrees to hold [CSI] harmless from all such claims." Moreover, Paragraph 5 and subparagraph 15(3) of the 2011 Credit Policy, General Usage and Terms & Conditions part of the Agreement, and the Swing Stage/Hanging Platforms General Conditions for Sale, Lease or Work Performed part of the Agreement, contain no limitations on the liability AAA-1 agrees to indemnify and hold CSI free and harmless from.

By its plain terms, the Agreement states that AAA-1 is obligated to indemnify and defend Chicago Scaffolding from all claims and actions caused or claimed to be caused by the Swing Stage Scaffold or by the liability or conduct of CSI, *i.e.*, CSI's own negligence. The above provisions entirely relieve CSI for its own negligence. *See Camper*, 2013 IL App (1st) 121589, at *58 (indemnification provision seeking to indemnify indemnitee for "any and all claims" included the indemnitee's own negligence and was void as against public policy); *Liccardi*, 283 Ill. App. 3d at 148 (language calling for full indemnification regardless of the parties' relative fault are void under the Act; there is no requirement that the contract specify that one party must indemnify the other party for the other party's "own negligence"). Because the Agreement, and the indemnification provisions therein are subject to the Act, the indemnification provisions are void and unenforceable. In turn, none of the exceptions to the Policy's Contractual Liability Exclusion apply, as that part of the Agreement wherein AAA-1 assumed the tort liability of CSI is void and does not qualify as an "insured contract" under the Policy.

## CONCLUSION

Scottsdale has no duties or obligations to AAA-1 arising out of AAA-1's alleged duty to indemnify CSI pursuant to the Agreement. Because the Agreement is a construction contract and requires AAA-1 to indemnify CSI for CSI's own negligence, the Agreement is void and unenforceable per the Act.

WHEREFORE, Plaintiff Scottsdale respectfully requests that this Court enter default judgment against Defendant AAA-1 Masonry & Tuckpointing, Inc.

Dated: September 30, 2014

Respectfully submitted,

**SCOTTSDALE INSURANCE COMPANY**

/s/Jonathan L. Schwartz
One of Its Attorneys

Jonathan L. Schwartz, Esq. (ARDC #6287338)
Davis J. Kim, Esq. (ARDC #6293122)
GOLDBERG SEGALLA LLP
311 S. Wacker Dr., Suite 2450
Chicago, IL 60606
312-572-8411 (phone)/312-572-8401 (fax)
jschwartz@goldbergsegalla.com
dkim@goldbergsegalla.com

 **Nautilus Insurance Company, Plaintiff, v. Front Range Environmental, LLC, Defendant.**

**Case No: 14 CV 50083**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

***2014 U.S. Dist. LEXIS 124135***

**August 6, 2014, Decided**
**August 6, 2014, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Motion granted by, Judgment entered by *Nautilus Ins. Co. v. Front Range Envtl., LLC, 2014 U.S. Dist. LEXIS 123676 (N.D. Ill., Sept. 5, 2014)*

**COUNSEL:** [*1] Nautilus Insurance Company, Plaintiff, Pro se, Chicago, IL USA.

**JUDGES:** Iain D. Johnston, U.S. Magistrate Judge.

**OPINION BY:** Iain D. Johnston

**OPINION**

**ORDER**

It is this Court's Report and Recommendation that the Plaintiff's Motion for Entry of Default Judgment [Dkt. # 16] be granted. The parties shall file any objections to this report and recommendation by August 25, 2014. The status hearing and presentment of the motion set for 8/7/2014 at 10:00 AM is stricken and no appearances are necessary.

**STATEMENT**

FACTS

On April 21, 2013, Nautilus Insurance Company ("Plaintiff") filed its Complaint for Declaratory Judgment against Front Range Environmental, LLC ("Defendant"). Dkt. # 1. The Defendant is also a party in an underlying state court case pending in Jefferson County, Colorado District Court, *Wal-Mart Stores, Inc. v. Front Range Environmental et al.,* Case No. 2013 CV 32289 ("Wal-Mart Lawsuit"). Dkt. # 7, ¶ 10-13. In the Wal-Mart Lawsuit, Wal-Mart Stores, Inc. seeks reimbursement for a settlement it paid to Holly Averyt, who was allegedly injured when she slipped and fell on ice and grease at a Colorado Wal-Mart store. Dkt. #1, Ex. B, ¶¶ 17-21. The Plaintiff here, Nautilus Insurance Company, is not a party to the Wal-Mart [*2] Lawsuit.

The Plaintiff issued Environmental Combined Policy No. ECPC1516377-10 ("Primary Policy") and Excess Liability Insurance Policy No. FFX1516375-10 ("Excess Policy") to the Defendant (collectively the "Policies"). Dkt. # 7, ¶¶ 8-9. The Policies were effective from May 1, 2010 to May 1, 2011 ("Policy Period").[1] Dkt. #15, Amended Ex. G., Policy Declarations Page; Dkt. #15, Amended Ex. H., Policy Declarations Page. The Plaintiff seeks a declaratory judgment relieving it of any duty to defend or indemnify the Defendant in connection with the Wal-Mart Lawsuit under the terms of the Policies.

1 The Defendant added "Professional Liability" coverage to the Primary Policy effective February 7, 2011. Dkt. #15, Amended Ex. G., Policy Changes.

The Plaintiff filed an Amended Complaint [2] on April 28, 2014. Dkt. # 7. On May 27, 2014, summons was issued for the Defendant. Dkt. # 8. The Plaintiff executed service on the Defendant on May 27, 2014, and the Defendant's responsive pleading was due by June 17, 2014. Dkt. # 10. The Defendant did not file an appearance or an answer in this matter.

2 The Plaintiff filed its Amended Complaint to include amended jurisdictional allegations alleg-

ing the name and citizenship [*3] of each member of Defendant LLC as directed by the District Court on April 23, 2014. Dkt. ## 6, 7 ¶ 5.

On July 11, 2014, the Clerk entered a default order against the Defendant pursuant to *Federal Rule of Civil Procedure 55(a)*. Dkt. # 14. On July 23, 2014, Plaintiff moved for entry default judgment against the Defendant pursuant to *Federal Rule Civil Procedure 55(b)(2)*. Dkt. # 16.

LEGAL STANDARD

*Federal Rule of Civil Procedure 55* governs the entry of default judgment. *See Lowe v. McGraw-Hill Companies, Inc., 361 F.3d 335, 339 (7th Cir. 2004)*. Obtaining a default judgment is a two-step process, as "*Rule 55 of the Federal Rules of Civil procedure* draws a distinction between an entry of a default, *Rule 55(a)*, and the entry of judgment by default, *Rule 55(b)*." *Thacker v. Menard, Inc., 86 F.3d 1158 (Table)*, [published in full-text format at *1996 U.S. App. LEXIS 12635*], *1996 WL 267456, at *1 (7th Cir. 1996)*. Under *Rule 55(a)*, the clerk must enter a party's default when that party "has failed to plead or otherwise defend." *Fed. R. Civ. P. 55(a)*. The entry of a default by the clerk is a formal matter, and not a final judgment. *See U.S. v. Hansen, 795 F.2d 35, 37 (7th Cir. 1986)* ("But an order of default is not a final judgment, though a default judgment is. . . . The default order was an intermediate, ministerial . . . docket entry.").

To complete the default judgment process, the default judgment must be entered pursuant to *Rule 55(b)*. *Fed. R. Civ. P. 55(b)*. Under *Rule 55(b)(1)*, the clerk may enter judgment if "the plaintiff's claim is for a sum certain . . . ." *Fed. R. Civ. P. 55(b)(1)*. "In all other cases, the party must apply to the court for a default judgment." *Fed. R. Civ. P. 55(b)(2)*. A default judgment "established, as a matter of law, [*4] that defendants are liable to plaintiff as to each cause of action alleged in the complaint." *U.S. v. Di Mucci, 879 F.2d 1488, 1497 (7th Cir. 1989)*. The decision to enter default judgment lies within the discretion of the district court. *O'Brien v. R.J. O'Brien & Associates, Inc., 998 F.2d 1394, 1398 (7th Cir. 1993)*.

ANALYSIS

On July 11, 2014, the Clerk entered default against the Defendant. Dkt. # 14. Now, the Plaintiff moves this Court to complete the default judgment process and enter default judgment against the defaulted Defendant. Dkt. # 16. Here, however, Plaintiff's complaint does not seek to recover monetary damages, but rather a declaratory judgment. Nonetheless, "[i]t is well-settled that the court has authority to enter declaratory default judgments as well as default judgments for monetary damages." *Tygris Asset Finance, Inc. v. Szollas, No. 09 C 4488, 2010 U.S. Dist. LEXIS 56491, 2010 WL 2266432, at *6 (N.D. Ill. June 7, 2010)*; *see also Owners Ins. Co. v. Complete Mech. Servs., Inc., No. 08 C 4201, 2008 U.S. Dist. LEXIS 88753, 2008 WL 4821654, at *1-2 (N.D. Ill. Oct. 31, 2008)*. It has also been established that "[u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc., 722 F.2d 1319, 1323 (7th Cir. 1983)*.

The Plaintiff is entitled to the declaratory default judgment it seeks in this case. The Policies issued by Plaintiff bar coverage for incidents occurring outside of the policy period and contain exclusions for expected injury and known conditions, which are quoted at length in Plaintiff's Amended Complaint for Declaratory Judgment. Dkt. # 7, ¶¶ 24-39. For the reasons [*5] set forth in paragraph 41 of the Plaintiff's Amended Complaint for Declaratory Judgment, the allegations contained within the underlying Wal-Mart Lawsuit fall within the scope of the exclusions of the Policies, and therefore the Policies do not provide coverage for those claims. Dkt. # 7, ¶¶ 41 (A-P).

Specifically, the Primary Policy provides coverage for (A) bodily injury and property damage liability, (B) personal and advertising injury liability, (C) medical payments, (D) contractors' pollution liability, and (E) professional liability. Dkt. # 15, Amended Ex. G, Sec. I., Cov. A-E. The Primary Policy provides coverage under the "Bodily Injury and Property Damage Liability" and "Medical Payments" provisions only for incidents occurring *during the policy period*, which was from May 1, 2010 to May 1, 2011. Dkt. # 15, Amended Ex. G, Sec. I., Cov. A, 1(b)(2) ("This insurance applies to bodily injury and property damage only if: ... The bodily injury or property damage occurs during the policy period"); Dkt. # 15, Amended Ex. G, Sec. I., Cov. C (1)(a)(1) ("We will pay medical expenses as described below for bodily injury caused by an accident...provided that: [t]he accident takes place...during [*6] the relevant policy period..."). The accident and subsequent settlement giving rise to the Wal-Mart Lawsuit involved bodily injury which occurred on December 13, 2007, nearly two and a half years before the Policy Period began. Dkt. # 7, ¶ 41(A); Ex. A, ¶¶ 9-14. Accordingly, there is no coverage under the Primary Policy for bodily injury and property damage liability or medical payments related to the underlying Wal-Mart Lawsuit.

Regarding coverage for "Contractor's Pollution Liability" and "Professional Liability", the Primary Policy excludes coverage for claims arising out of known conditions. Dkt. # 15, Amended Ex. G, Sec. I., Cov. A, 2(l); Cov. E, 2(p). This exclusion is applicable because the

Defendant allegedly knew of the grease spill at the time of the incident and could have reasonably foreseen it would have given rise to the claim; indeed the Defendant was hired to clean up the grease spill, which allegedly caused Averyt's accident. Dkt. # 7, ¶ 41(H-L) and Ex. B. ¶ 16. Additionally, the "Personal and Advertising Injury Liability" and "Contractor's Pollution Liability" sections exclude coverage for claims arising out of rendering professional services, such as Wal-Mart's claim [*7] that the Defendant was negligent in removing the grease which caused the Averyt accident. Dkt. # 15, Amended Ex. G, Sec. I., Cov. A, 2(m) and Sec. II, Exclusions Applicable to Coverages A and B, (6); Dkt. # 7, ¶ 41(H-L) and Ex. B. ¶ 16-17.

Finally, there is no coverage under the Excess Policy because it incorporates the same terms as the Primary Policy. Dkt. # 15, Amended Ex. H, Sec. II.(2) ("Notwithstanding anything to the contrary, if any Underlying Insurance excludes or otherwise does not cover damages (for reasons other than the exhaustion of the Underlying Limits), then this policy will not provide coverage for such damages.")

Because the Policies do not provide coverage for any of the allegations contained in the Wal-Mart Lawsuit, the Plaintiff is not obligated to defend or indemnify the Defendant in that action. There is a factual basis here for declaratory default judgment, and it is this Court's Report and Recommendation that Plaintiff's motion for entry of default judgment [Dkt. # 16] should be granted against the defaulted Defendant.

CONCLUSION

It is the Court's Report and Recommendation that Plaintiff's Motion for Entry of Default Judgment [Dkt. # 16] be granted. The parties [*8] shall file any objections to this report and recommendation by August 25, 2014.

Date: August 6, 2014

/s/ Iain D. Johnston

U.S. Magistrate Judge Iain D. Johnston



**TYGRIS ASSET FINANCE, INC., a Delaware corporation, successor to Marcap Corp., Plaintiff, v. ROSEMARY SZOLLAS and CYNTHIA BARSA, Defendants. ROSEMARY SZOLLAS, Cross-Plaintiff, v. CYNTHIA BARSA, and OASIS CENTER FOR WELLNESS AND BEAUTY, LLC, a Florida limited liability corporation, Cross-Defendants.**

**Case No. 09 C 4488**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2010 U.S. Dist. LEXIS 56491*

**June 7, 2010, Decided**
**June 7, 2010, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Tygris Asset Fin., Inc. v. Szollas, 2010 U.S. Dist. LEXIS 63087 (N.D. Ill., June 21, 2010)*

**COUNSEL:** [*1] For Tygris Asset Finance, Inc., a Delaware corporation successor MarCap Corporation, Plaintiff: Gary Eugene Green, LEAD ATTORNEY, Adam C Toosley, Clark Hill PLC, Chicago, IL.

For Rosemary Szollas, an individual, Defendant: Janice A Alwin, LEAD ATTORNEY, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL.

For Cynthia Barsa, an individual, Defendant: Philip A. Creed, LEAD ATTORNEY, McCarthy and Levin, Chicago, IL.

For Rosemary Szollas, an individual, Cross Claimant: Janice A Alwin, LEAD ATTORNEY, Barack Ferrazzano Kirschbaum & Nagelberg LLP, Chicago, IL.

For Cynthia Barsa, an individual, Cross Defendant: Philip A. Creed, LEAD ATTORNEY, McCarthy and Levin, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tygris Asset Finance, Inc. ("Tygris") brought this action against Defendants Rosemary Szollas and Cynthia Barsa to recover damages for breach of a lease agreement. (Compl., Doc. No. 1.) Szollas, in turn, filed claims against Cross-Defendant Barasa and Third-Party Defendant Oasis Center for Wellness and Beauty, LLC ("Oasis"), seeking indemnification for any judgment entered against Szollas in favor of Tygris, and a [*2] declaration of non-liability under the lease agreement. (Answer to Compl., Affirmative Defenses, and Crosscl., Doc. No. 21.) This matter comes before the court on Szollas' "motion for default and default judgment" against Barsa and Oasis. (Doc. No. 29.) For the reasons set forth below, Szollas' motion is granted in part and denied in part.

**I. BACKGROUND**

According to the complaint, Oasis entered into an agreement to lease a "Cynosure Apogee Elite Laser System and Tri-Active System" from Tygris. (Compl. P 7.) Barsa and Szollas allegedly signed the lease as Oasis' guarantors, "unconditionally, jointly and severally, guarantee[ing] the prompt payment . . . of Oasis to Tygris." (*Id.* PP 16-17; *see also* Lease Agreement, Ex. 1 to Compl., Doc. No. 20.) Tygris delivered the laser to Oasis, but Oasis allegedly failed to make the monthly payments required under the lease. (Compl. PP 8-10.) When Oasis ignored Tygris' demand for payment, Tygris

filed suit against Szollas and Barsa pursuant to the guaranty. (*Id.*)

Szollas filed a cross-claim against Barsa and a third-party complaint against Oasis, seeking indemnification for any judgment entered against Szollas in favor of Tygris, and a declaration of [*3] non-liability under the guaranty. (Answer to Compl. and Affirmative Defenses, Crosscl.) Summonses were served on Barsa and Oasis, and returned executed on October 1, 2009. (Summonses, Doc. Nos. 27 and 28.) Under *Federal Rule of Civil Procedure 12(a)(1)(B)*, Barsa and Oasis were required to respond to Szollas' cross-claim and third-party complaint on or before October 21, 2009, but failed to do so. (Supplement to Mot. P 3, Doc. No. 38.)

On November 9, 2009, attorney Philip A. Creed entered an appearance on behalf of Barsa. (Appearance, Doc. No. 31.) Szollas filed the instant motion for entry of default and default judgment two days later. (Mot.) The court subsequently granted Barsa's oral motion for leave to file an answer to Szollas' cross-claim, and Barsa filed her answer to the cross-claim on December 16, 2009. (Minute Entry, Nov. 19, 2009, Doc. No. 32; Answer to Cross-cl., Doc. No. 33.) Oasis has yet to enter an appearance or respond to Szollas' third-party complaint.

**II. LEGAL STANDARD**

"*Federal Rule of Civil Procedure 55* governs default judgments in federal court." *Silberman v. Wigod, 914 F.2d 260 (Table)*, [published in full-text format at *1990 U.S. App. LEXIS 15578], 1990 WL 127568, at *4 (7th Cir. 1990)*; *see Fed. R. Civ. P. 55*. It is important [*4] to note that *Rule 55* "draws a distinction between an entry of a default, [in] *Rule 55(a)*, and the entry of judgment by default, [in] *Rule 55(b)*." *Thacker v. Menard, Inc., 86 F.3d 1158 (Table)*, [published in full-text format at *1996 U.S. App. LEXIS 12635], 1996 WL 267456, at *1 (7th Cir. 1996)*.

*Rule 55(a)* provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Fed. R. Civ. P. 55(a)*. The entry of a default "is merely a formal matter and does not constitute entry of a judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2682 (3d ed. 2010); *see also U.S. v. Hansen, 795 F.2d 35, 36 (7th Cir. 1986)* ("[A]n order of default is not a final judgment, though a default judgment is. . . .[A] default order [is] an intermediate, ministerial, nonjudicial, virtually meaningless docket entry . . . ."). "Although *Rule 55(a)* . . . refers to entry of default by the clerk, it is well-established that a default also may be entered by the court." *Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc., 687 F.2d 182, 185 (7th Cir. 1982)*. When motion is made to the court for [*5] entry of a default, "the decision to enter default lies within the district court's discretion." *Arnold v. Boatmen's Nat'l Bank of Belleville, 89 F.3d 838 (Table)*, [published in full-text format at *1996 U.S. App. LEXIS 15669], 1996 WL 359778, at *2 (7th Cir. 1996)*; *O'Brien v. R.J. O'Brien & Assoc's, Inc., 998 F.2d 1394, 1398 (7th Cir. 1993)*.

Under *Rule 55(b)(2)*, "the court may enter a default judgment if the amount at issue is for a sum certain." *Am. Nat'l Bank & Trust Co. of Chi. v. Alps Elec. Co., No. 99 C 6990, 2002 U.S. Dist. LEXIS 5413, 2002 WL 484845, at *1 (N.D. Ill. Mar. 29, 2002)* (citing *Fed. R. Civ. P. 55(b)(2)*). "A party is not entitled to a default judgment as a matter of right." *Jordan v. Van Dyke, No. 99 C 5357, 2000 U.S. Dist. LEXIS 938, 2000 WL 126784, at *2 (N.D. Ill. Feb. 1, 2000)*. Rather, "[t]he decision to enter a default judgment lies within the discretion of the district court." *Am. Nat'l Bank & Trust, 2002 U.S. Dist. LEXIS 5413, 2002 WL 484845, at *1*. The court can "decline[] to enter a default judgment . . . even if it may be technically justified." *Jordan, 2000 U.S. Dist. LEXIS 938, 2000 WL 126784, at *2*. In determining whether to enter a default judgment, courts consider "[t]he amount of money potentially involved, the presence or absence of disputed factual issues or issues of public importance, whether the default was largely [*6] technical, whether the plaintiff was substantially prejudiced by the delay, and whether the grounds for default are clearly established . . . ." *Am. Nat'l Bank & Trust, 2002 U.S. Dist. LEXIS 5413, 2002 WL 484845, at *1*.

"It would be an inefficient use of the parties' and this court's time and resources to grant Plaintiff's motion for a default judgment knowing that such judgment would be promptly set aside pursuant to *Rule 55(c)* [or *Rule 60(b)*]." *Macri v. Yamauchi, No. 01 C 50168, 2002 U.S. Dist. LEXIS 4042, 2002 WL 390223, at *4 (N.D. Ill. Mar. 11, 2002)*. As a result, courts often consider *Rules 55(c)* and *60(b)* in determining whether to enter a default or default judgment. *See id. Rule 55(c)* provides that "[t]he court may set aside an entry of default for good cause, and it may set aside a default judgment under *Rule 60(b)*." *Fed. R. Civ. P. 55(c)*. *Rule 60(b)*, in turn, provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment . . . for," among other reasons, "mistake, inadvertence, surprise, or excusable neglect." *Fed. R. Civ. P. 60(b)(1)*. Courts have recognized that "'good cause' [under *Rule 55(c)*] is not sharply distinguishable from 'excusable neglect' [under *Rule 60(b)*,] if it is distinguishable [*7] at all." [1] *Conn. Nat'l Mortgage Co. v. Brandstatter, 897 F.2d 883, 885 (7th Cir. 1990)*. A party seeking to vacate an entry of default or default judgment must show: "(1) good cause for the default; (2) quick action to correct it; and (3) a

meritorious defense to the complaint." *Cracco v. Vitran Exp., Inc., 559 F.3d 625, 630 (7th Cir. 2009)*; *see also Jones v. Phipps, 39 F.3d 158, 163 (7th Cir. 1994)*. "While the same test applies for motions seeking relief from default judgment under both *Rule 55(c)* and *Rule 60(b)*, the test 'is more liberally applied in the *Rule 55(c)* context,'" which is to say before judgment has actually been entered. *Cracco, 559 F.3d at 631* (quoting *U.S. v. Di Mucci, 879 F.2d 1488, 1495 (7th Cir. 1989))*. This is consistent with the Seventh Circuit's "policy of favoring trial on the merits over default judgment." *Cracco, 559 F.3d at 631*.

1 "The determination of excusable neglect is 'an equitable one, taking account of all relevant circumstances surrounding the party's omission.'" *Fields v. Booker, 283 Fed. Appx. 400, 402 (7th Cir. 2008)* (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993))*. The Supreme Court identified several factors [*8] relevant to whether a party's neglect of a deadline is excusable: "[T]he danger of prejudice, the length of the delay and its potential impact on judicial proceedings, the reasons for delay, including whether it was within reasonable control of the movant, and whether the movant acted in good faith." *Comerica Bank v. Esposito, 215 Fed. Appx. 506, 508 (7th Cir. 2007)* (quoting *Pioneer Inv. Servs., 507 U.S. at 395*).

**III. ANALYSIS**

**A. Entry of Default and Default Judgment Against Barsa**

Szollas argues that Barsa's "reasons for failing to timely respond to the Cross-Claim do not rise to excusable neglect . . . ." (Reply at 2, Doc. No. 41.) Barsa argues that her tardiness should be excused because "[a] hip fracture, my father's [medical] condition, the separation from [my] husband, [my] cancer diagnosis and the difficulty in finding a Chicago attorney [from Barsa's home in Florida] all contributed to my delay in responding to the Summons and Complaint in this case." (Resp. at 2, Doc. No. 40; Barsa Aff. P 16, Doc. No. 35-1.) Although the court does not entirely agree with Barsa's position, the court nonetheless declines to enter a default or default judgment against Barsa.

As a threshold matter, [*9] Barsa's personal health and family issues do not provide her with a valid excuse for failing to file a timely answer to Szolla's cross-claim. Courts in this district have consistently held that a litigant's "personal circumstances," including health problems and/or family issues, do not constitute "good cause" or "excusable neglect" for failing to file a responsive pleading. *See Middleton v. N. Shore Movers, Inc., No. 03 C 4246, 2004 U.S. Dist. LEXIS 523, 2004 WL 783157, at *3 (N.D. Ill. Jan. 13, 2004)* (holding that plaintiff's illness not good cause to vacate default judgment); *Medline Indus., Inc. v. Medline Rx Fin., LLC, 218 F.R.D. 170, 173 (N.D. Ill. 2003)* (same); *U.S. v. 225 Standish St., Elgin, Ill., No. 91 C 8228, 1992 U.S. Dist. LEXIS 7244, 1992 WL 122815, at *2 (N.D. Ill. May 26, 1992)* (same), *aff'd, 993 F.2d 1550 (7th Cir. 1993)*; *Silberman v. Wigod, No. 85 C 9090, 2010 U.S. Dist. LEXIS 56395, 1988 WL 1053505, at *2 (N.D. Ill. Oct. 5, 1988)* (same), *aff'd, 914 F.3d 260 (7th Cir. 1990)*. "When unpredictable and unfortunate circumstances arise . . . [a litigant] should inform the court before the filing deadline passes why he will be unable to comply, and if that is not possible, should inform the court as soon as practicably possible why the filing was late." [*10] *Medline Indus., 218 F.R.D. at 173*. If Barsa believed that her personal and family problems were going to prevent her from answering the cross-claim in time, she should have contacted the court or opposing counsel to seek an extension. Yet Szollas maintains--and Barsa does not deny--that "[a]t no time prior to the November 18, 2009 hearing on the Default Motion did Ms. Barsa or her counsel of record contact Dr. Szollas or request additional time to answer or otherwise plead." [2] (Mot. P 6.)

2 Although a litigant's personal circumstances will rarely qualify as excusable neglect, "a family emergency constitutes good cause for . . . absence on the date of the default." *Rank DMS, LLC v. Direct Disk Network, Inc., No. 06 C 1666, 2008 U.S. Dist. LEXIS 22127 2008 WL 4347736, at *4 (N.D. Ill. Mar. 19, 2008)*. Barsa blames her failure to file a timely answer in part on her father's medical condition. (*See* Barsa Aff. P 16.) But the facts set forth in Barsa's affidavit indicate that she returned from visiting her ailing father in July of 2009, several months before Szollas' cross-claim was filed. (*See id.* PP 3-5.) Barsa's father's illness does not therefore provide Barsa with "good cause" [*11] for her lateness in filing an answer.

Barsa's alleged inability to find an Illinois attorney from her place of residence in Florida is similarly unavailing. Barsa cites no authority for the proposition that an out-of-state litigant should be excused from filing a timely responsive pleading because of his or her failure to locate an attorney where the suit is pending. (*See* Resp.) Caselaw in this district is clearly to the contrary, holding that a foreign defendant's difficulty obtaining local representation does not constitute "good cause" to vacate (or refrain from entering) a default judgment. *See Inquote Corp. v. Cole, No. 99 C 6232, 2002 U.S. Dist. LEXIS 5420, 2002 WL 483417, at *2 (N.D. Ill. Mar. 29,*

*2002)* (holding that out-of-state litigant's difficulty obtaining counsel does not constitute good cause to set aside default); *Khetarpal v. Malini, No. 99 C 6896, 2002 U.S. Dist. LEXIS 2362, 2002 WL 206004, at *2 (N.D. Ill. Feb. 7, 2002)* (same). Again, Barsa could easily have contacted the court or opposing counsel to seek an extension but did not.

Nonetheless, the court declines to enter a default or default judgment against Barsa for two reasons. First, the delay resulting from Barsa's failure to file a timely answer is not particularly [*12] significant. *See Mommaerts v. Hartford Life Ins. and Accident Ins. Co., 472 F.3d 967, 968 (7th Cir. 2007)* (holding that failure to file timely answer was excused where "delay was short"); *Jordan, 2000 U.S. Dist. LEXIS 938, 2000 WL 126784, at *2* (same). Barsa filed her answer less than two months after the deadline had passed. (*See* Answer to Cross-cl.) Szollas does not claim, nor could she, that her ability to litigate the case will be prejudiced by this relatively brief delay. (*See* Mot., Reply.) Second, Barsa has demonstrated that she has a "meritorious defense" to liability. (*See* Resp.) "A meritorious defense is not necessarily one which must, beyond a doubt, succeed in defeating a default judgment, but rather one which at least raises a serious question regarding the propriety of a default judgment and which is supported by a developed legal and factual basis." *Jones, 39 F.3d at 165*. Szollas claims that she is entitled to a declaration of non-liability because Szollas "signed the Equipment Lease and guaranty solely in her capacity as an employee of Oasis Center and for the limited purpose of registering as the licensed physician." (Answer and Cross-Cl. P 7.) Barsa contests these allegations on their merits, [*13] arguing that "the lease and guaranty do not exhibit any representative capacity." (Resp. at 2.) A copy of the lease, appended to Tygris' complaint as an exhibit, appears to support Barsa's position. (*See* Lease Agreement.) Szollas further claims that she is entitled to indemnification because Barsa duped her into personally guaranteeing Oasis' performance, when Szollas intended to sign the lease only in her "capacity as an employee." (*See* Answer to Compl., Affirmative Defenses and CrossCl. P 7.) Barsa disputes this too, alleging that "Szollas was to become a member of Oasis Center and it was for that reason that she signed the lease and guaranty." (Resp. at 3.) In light of the relatively brief delay occasioned by Barsa's technical default, her meritorious defenses, and the Seventh Circuit's "policy of favoring trial on the merits over default judgment," *Cracco, 559 F.3d at 630-31*, the court denies Szollas' motion for entry of a default or default judgment against Barsa. [3]

3 Szollas suggests that the court should not have granted Barsa's motion for leave to file her answer late because "[a]t no time during that hearing [when Barsa was given leave to file an answer] did counsel for Ms. [*14] Barsa provide any . . . reason for Ms. Barsa's failure to timely meet the Answer deadline." (Supplement to Mot. at 2.) "A district court does not abuse its discretion in granting a party an enlargement of time to file a pleading if the party demonstrates 'excusable neglect' for its delay." *Arnold, 89 F.3d 838* (table), [published in full-text format at *1996 U.S. App. LEXIS 15669], 1996 WL 359778, at *2*. To the extent the court did not expressly address the issue of excusable neglect at the November 19, 2009 hearing, the court does so now and finds that the standard has been met.

**B. Award of Attorneys Fees Against Barsa**

Szollas argues that she "will be unduly prejudiced if Ms. Barsa is permitted to answer the Cross-Claim without reimbursing Dr. Szollas for the attorneys' fees and costs associated with filing and presenting the Default Motion . . . ." (Reply at 3.) Barsa counters by arguing that there is no statutory authority for the attorney's fees sought by Szollas, and "Szollas has not and cannot allege that Barsa has acted in bad faith or engaged in conduct intended to delay or harass Szollas." (Resp. at 4.) The court disagrees with both parties' positions, but will not hold Barsa liable for the costs and attorney's fees incurred by Szollas in [*15] moving for a default judgment.

In deciding a motion to vacate a default, "the court has broad discretion to impose certain terms or conditions on the defaulting party to remedy prejudice or expense that the nondefaulting party suffered as a result." *Mellon Stuart Co. v. Rizzi's Year-Round Outdoor Maintenance, Inc., No. 87 C 8087, 1988 U.S. Dist. LEXIS 7505, 1988 WL 76966, at *2 (N.D. Ill. July 19, 1988)*. It is "not unusual" for courts in this district to require the defaulting party to "reimburse[e] plaintiffs and their counsel for the reasonable attorneys' fees and expenses that they have incurred in connection with the . . . motion for default . . . ." *Davis v. Coopers & Lybrand, No. 90 C 7173, 1988 U.S. Dist. LEXIS 7505, 1991 WL 172953, at *2 (N.D. Ill. Aug. 29, 1991)* (setting aside default judgment, but granting non-defaulting party's motion for attorney's fees); *see also Flexicorps, Inc. v. Beck, No. 02 C 8167, 2003 U.S. Dist. LEXIS 1388, 2003 WL 223441, at *2 (N.D. Ill. Jan. 31, 2003)* (same); *Mellon Stuart, 1988 U.S. dist. LEXIS 7505, 1988 WL 76966, at *2* (same). Where a plaintiff's conduct "in pursuing that matter to [default] judgment was entirely reasonable and was occasioned by the . . . negligence on the defense side of the dispute, it would not be fair to burden [the plaintiff] with [*16] having to swallow the expense of its legitimate effort." *Flexicorps, 2003 U.S. Dist. LEXIS 1388, 2003*

*WL 223441, at *2*. This reasoning applies with equal force to situations where a defendant fails to file a responsive pleading but appears just in time to oppose the plaintiff's motion for default judgment. *See Allen Russel Publ'g, Inc. v. Levy, 109 F.R.D., 315, 321 (N.D. Ill. 1985)* (awarding costs and attorney's fees associated with bringing justified but unsuccessful motion for default judgment).

The court is not convinced that Szollas was "entirely reasonable" in filing the instant motion for default judgment. *See Flexicorps, 2003 U.S. Dist. LEXIS 1388, 2003 WL 223441, at *2*. Although Barsa was late in responding to Szollas' cross-claim, Barsa's attorney nonetheless entered an appearance prior to the filing of Szollas' motion for default. (*See* Appearance; Mot.) The appearance was a clear indication of Barsa's desire to participate in the lawsuit, tardy though it may have been. In light of the Seventh Circuit's "policy of favoring trial on the merits over default judgment," *Cracco, 559 F.3d at 631*, and the lack of delay or prejudice caused by Barsa's conduct, Szollas should have known that her motion for default judgment was unlikely to [*17] succeed. Yet Szollas not only persisted in seeking the entry of a default judgment, she filed two additional briefs in support of her position even after Barsa filed an answer to the cross-claim. (*See* Supplement to Mot; Reply.) The court will not require Barsa to pay the costs and attorneys' fees associated with Szollas' excessively zealous effort to obtain a default judgment. [4]

4 The only case cited by Szollas in support of her position, *Mellon Stuart Co. v. Rizzi's Year-Round Outdoor Maintenance, Inc.,1988 U.S. Dist. LEXIS 7505, 1988 WL 76966*, is easily distinguishable since the defaulting party in *Mellon Stuart* had not entered an appearance or otherwise attempted defend the case before the motion for default was filed. (*See* Reply at 2 n.3.)

### C. Entry of Default and Default Judgment Against Oasis

Szollas has adequately demonstrated, and the docket confirms, that Oasis has failed to appear or file a timely answer to Szollas' third-party complaint. (*See* Mot.) "Even when a default judgment is warranted based on a party's failure to defend," however, "the allegations in the complaint with respect to the amount of the damages are not deemed true." *In re Catt, 368 F.3d 789, 792 (7th Cir. 2004)* (quoting *Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 154-55 (2d Cir. 1999))*. [*18] "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Id.* It is therefore incumbent upon the court to determine whether the relief Szollas requests can be provided in a default judgment.

Szollas seeks a judgment against Oasis, "declaring that Dr. Szollas is not personally liable under the guaranty," and "rescinding the guaranty as to Dr. Szollas." (Mot. at 6.) It is well-settled that the court has authority to enter declaratory default judgments as well as default judgments for monetary damages. *See Owners Ins. Co. v. Complete Mech. Servs., Inc., No. 08 C 4201, 2008 U.S. Dist. LEXIS 88753, 2008 WL 4821654, at *1-2 (N.D. Ill. Oct. 31, 2008)* (entering default declaratory judgment of non-liability). The court will therefore enter a default judgment declaring the guaranty invalid as between Oasis and Szollas. Oasis is hereby precluded from claiming any kind of contribution or indemnification from Szollas under the guaranty. This will not, of course, prevent Tygris from enforcing the guaranty against Szollas. *See Principal Mut. Life Ins. Co. v. Eady, 889 F. Supp. 1067, 1072 (N.D. Ill. 1995)* (holding that admissions in default judgment could not be [*19] enforced by non-defaulting second party against non-defaulting third party in same litigation).

Szollas also seeks an order "directing Oasis Center . . . to pay any judgment entered in favor of Tygris." (Mot. at 6.) This request is ambiguous. To the extent Szollas seeks a declaratory judgment holding Oasis liable for any amounts Szollas is forced to pay Tygris, the motion is granted. *See Owners Ins.,2008 U.S. Dist. LEXIS 88753, 2008 WL 4821654, at *1-2*. To the extent Szollas seeks a money judgment against Oasis, or an order directing Oasis to reimburse Szollas for any judgment entered against her, the motion is denied. Since no judgment has yet been entered against Szollas, it is impossible for the court to "ascertain the amount of damages with reasonable certainty." *See Peterson v. Olson, No. 05 CV 3475, 2006 U.S. Dist. LEXIS 28869, 2006 WL 1215385, at *3-4 (N.D. Ill. May 2, 2006)* (holding that non-defaulting party not entitled to "speculative" damages). Szollas is free, however, to move for entry of a default money judgment once her liability to Tygris (if any) has been assessed. [5]

5 "[A] default judgment is not appropriate if it would result in inconsistency among judgments with multiple defendants. . . . However, when different results [*20] as to different parties are not logically contradictory or inconsistent, such as in the case of joint and several liability, default judgment against a non-answering defendant is appropriate." *Sack v. Seid, No. 01 C 6747, 2002 U.S. Dist. LEXIS 20542, 2002 U.S. Dist. LEXIS 20542, 2002 WL 31409573, at *1 (N.D. Ill. Oct. 24, 2002)* (citing *Marshall & Isely Trust Co. v. Pate, 819 F.2d 806, 811 (7th Cir. 1987)*; *In re Unranium Antitrust Litig., 617 F.2d 1248, 1257*

*(7th Cir. 1980))*. Since Oasis and Barsa appear to be jointly and severally liable under the lease and guaranty, the court finds that no inconsistency will result from entering a default judgment against Oasis but not Barsa. (*See* Compl. PP 16-17; Lease.)

**IV. CONCLUSION**

Szollas' motion for default and default judgment against cross-defendant Barsa and third-party defendant Oasis [Doc. No. 29] is granted in part and denied in part.

ENTER:

/s/

JOAN B. GOTTSCHALL

United States District Judge

DATED: June 7, 2010

**OWNERS INSURANCE COMPANY, et al., Plaintiffs, v. COMPLETE MECHANICAL SERVICES, INC., et al., Defendants.**

**No. 08 C 4201**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

***2008 U.S. Dist. LEXIS 88753***

**October 31, 2008, Decided**
**October 31, 2008, Filed**

**COUNSEL:** [*1] For Owners Insurance Company, Auto-Owners Insurance Company, Plaintiffs: Robert Marc Chemers, LEAD ATTORNEY, Christopher C. Cassidy, Pretzel & Stouffer, Chtd., Chicago, IL.

For Complete Mechanical Services, Inc., Defendant: Cornelius F. Riordan, LEAD ATTORNEY, Riordan, McKee, & Piper, LLC., Chicago, IL; Regina E. Gaebel, Riordan, Donnelly, Lipinski & McKee, Ltd., Chicago, IL.

**JUDGES:** Milton I. Shadur, Senior United States District Judge.

**OPINION BY:** Milton I. Shadur

**OPINION**

*MEMORANDUM OPINION AND ORDER*

In this action by two insurers seeking a declaratory judgment as to their obligation (more accurately their asserted lack of obligation) to provide defenses in a number of actions arising out of the same congeries of facts, one of them--coplaintiff Owners Insurance Company ("Owners")--has moved for a default judgment against one of the three defendants, Thomas Flynn ("Flynn"). For the reasons stated in this memorandum opinion and order, Owners' motion is granted.

To begin with, the early entry of a default order (short of a judgment) has posed no difficulty. In that respect Flynn had executed a waiver of service form that expressly stated that any failure on his part to file a timely responsive pleading could give rise [*2] to a default:

> A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant.

Yet, having done so, Flynn has since ignored this lawsuit entirely (to and including his nonappearance this week in response to Owners' notice of presentment of the current motion).

That default order has brought into possible play the entry of a default *judgment* under *Fed. R. Civ. P. ("Rule") 55(b)(2)*--see, e.g., *Sun v. Bd. of Trs. of Univ. of Ill., 473 F.3d 799, 811 (7th Cir. 2007)* and cases cited there. As *Sun, id.* has said, default judgments are "appropriate only when a party willfully disregards pending litigation." Flynn has done just that, and the possibility of such a judgment order calls for a review of the merits of Owners' claim against him.

In this instance the underlying dispute as to which possible insurance coverage is in issue relates to an action brought against Flynn before the Illinois Human Rights Commission by [*3] Michael Ehrhardt ("Ehrhardt," who has also been joined here as a party defendant, but solely as "a nominal but interested party"

sought "to be bound by the judgment to be rendered in this cause" (Complaint P8)). Ehrhardt's claim is one of "hostile environment sexual harassment," predicated entirely on asserted *intentional* misconduct on Flynn's part.

In sharp contrast, Owners' policy at issue in this case--a policy issued to Complete Mechanical Services, Inc. ("Complete," also named as a defendant here) [1]--affords, as the only potentially relevant coverage applicable to Flynn, coverage that extends solely to *accidental* conduct. On that score a review of some of the policy's potentially relevant provisions is in order.

1 Both Flynn and Ehrhardt were employees of Complete at the time involved in Ehrhardt's charges, with Flynn being Ehrhardt's supervisor.

Owners has several arrows in its quiver in that regard. For one thing, the potentially relevant coverage extends only to "bodily injury" and "property damage," and Owner asserts that neither of those terms fairly describes the type of claim asserted by Ehrhardt against Flynn. Although that contention obviously has considerable force, it need [*4] not be explored further because the Ehrhardt-Flynn dispute clearly founders on other coverage shoals. Nor is it necessary to parse Owners' less persuasive argument (1) that the policy excludes coverage when "bodily injury" is suffered by an insured company's employee "arising out of and in the course of employment by the insured" and (2) that the claimed harassment of Ehrhardt by Flynn does not fit within that language.

Instead Owners properly (and principally) emphasizes that its policy coverage extends only to "bodily injury" or "property damage" that "is caused by an 'occurrence'" (Policy Coverage A P1.b.(1)). In addition, the policy's specific exclusions from coverage include "'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured" (Policy Coverage A P2.a).

In those respects Owners correctly submits that Illinois courts have consistently defined an "occurrence" to be "an accident involv[ing] the consideration of whether the injury was expected or intended from the standpoint of the insured" (*State Farm Fire & Cas. Co. v. Watters, 268 Ill.App.3d 501, 506, 644 N.E.2d 492, 496, 205 Ill. Dec. 936 (5th Dist. 1994)*--and see other cases cited in that opinion to the same [*5] effect). All of the egregious conduct that Ehrhardt has ascribed to Flynn is plainly the antithesis of "an accident," as well as being the antithesis of any conduct causing an injury that could be classified as "expected or intended from the standpoint of the insured." Instead Flynn's charged conduct unquestionably constituted intentional behavior that falls totally outside of the scope of an "occurrence" for purposes of policy coverage.

In sum, Owners has no obligation to defend Flynn in connection with Ehrhardt's proceeding before the Illinois Human Rights Commission. This Court so holds and declares, and a default judgment is entered in favor of Owners and against Flynn in that respect. Finally, this Court finds pursuant to *Rule 54(b)* that there is no just reason for delay, and it expressly directs the entry of a final judgment as to Flynn even though other claims remain pending against Complete (see, e.g., *Doe v. City of Chicago, 360 F.3d 667, 668-69 (7th Cir. 2004))*.

/s/ Milton I. Shadur

Milton I. Shadur

Senior United States District Judge

Date: October 31, 2008



**ILLINOIS POWER COMPANY, Plaintiff, v. DUKE ENGINEERING & SERVICES, INC., Defendant.**

**Case No. 99 C 5384**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

***2002 U.S. Dist. LEXIS 5497***

**March 29, 2002, Decided**

**DISPOSITION:** [*1] Count V dismissed, damages under Counts I and II limited to the compensation paid to Defendant under the February contracts, and judgment in favor of Defendant entered as to Count II to the extent that count is based on paragraph 19 of the 2/5/98 Agreement.

**COUNSEL:** For ILLINOIS POWER COMPANY, plaintiff: John Donovan Lien, Richard J. Phelan, Joan Marie G. Kubalanza, Andrew Louis Reisman, Foley & Lardner, Chicago, IL.

For DUKE ENGINEERING & SERVICES, INC., defendant: John D Lien, Foley & Lardner, Eric A. Oesterle, Sonnenschein, Nath & Rosenthal, Chicago, IL.

For DUKE ENGINEERING & SERVICES INC., defendant: Brian W. Fields, Charles W Gordon, David S. Ladwig, Sonnenschein Nath & Rosenthal, Kansas City, MO.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**ORDER**

Unsatisfied with defendant Duke Engineering & Services, Inc.'s ("DE&S") services, plaintiff Illinois Power Company ("Illinois Power") filed a five-count amended complaint, alleging (I) breach of contract, (II) breach of warranty, (III) deceptive trade practices, (IV) fraudulent misrepresentation, and (V) negligent misrepresentation. DE&S moves for partial summary judgment as to damages on Counts [*2] I, II, and V. For the reasons outlined below, the motion is granted although not in the precise form DE&S requested.

**I. Background**

The following facts are undisputed, unless otherwise indicated. Illinois Power is a public utility regulated by the State of Illinois. In August of 1998, Illinois Power requested that DE&S examine degraded voltage issues affecting the Clinton Power Station, a nuclear power plant. DE&S made a presentation to Illinois Power on September 9, 1997. By early October, the two parties had signed a "charter" describing a set of generic solutions to the degraded voltage problem to be delivered by May 31, 1998, and indicating that DE&S would serve as Project Manager. Various project plans and proposals followed. Illinois Power alleges, and DE&S denies, that before October 24, 1997, DE&S represented that it had sufficient personnel and could complete the degraded voltage project by May 31, 1998. Needless to say, the project was not completed by that date. Illinois Power alleges that DE&S knew or should have known that it could not meet the May 1998 deadline. More generally, Illinois Power charges repeated breach of contract, general incompetence, bad management, [*3] and an improper conflict of interest. The result, Illinois Power claims, was over $ 20,000,000 in damages, which Illinois Power seeks to recover in this diversity action.

Of particular relevance to the pending motion are two formal contracts signed by the parties in February of 1998. The first, signed February 5 but effective January 15, is a "Program Manager's Agreement." (Def.'s App.

Tab D ("2/5/98 Agreement"), at D017654.) The second contract, dated February 11, is styled simply as an agreement between Illinois Power and DE&S. (Def.'s App. Tab C ("2/11/98 Agreement"), at D017342.) Each contract contains an "entire agreement" clause purporting to supersede all prior representations. The relationship between the two documents is disputed, as will be explained below. Each contract also contains multiple provisions limiting damages. It is on the basis of these limitation-of-damages provisions that DE&S moves for partial summary judgment.

**II. Analysis**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [*4] moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "The nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986))*. Consistent with the choice-of-law provision in each contract (2/5/98 Agreement, at D017670; 2/11/98 Agreement, at D017357), the parties agree that Illinois law governs. The task of this court is therefore to predict how the Illinois Supreme Court would decide the issues presented. *Allen v. Transamerica Ins. Co., 128 F.3d 462, 466 (7th Cir. 1997)*. "Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Id.*

Given the complexity of the issues, a short preview of the court's analysis and conclusions may be helpful. Because Illinois Power seeks damages only for economic loss, it cannot [*5] proceed on a negligence theory. .The negligent misrepresentation claim, Count V, is therefore dismissed. The breach of contract and breach of warranty claims, Counts I and II, fare better, but Illinois Power's statutory and policy arguments against the enforceability of the contractual damage-limitation provisions fail. Accordingly, DE&S is entitled to partial summary judgment limiting damages on those two counts. The damages caps will be greater than DE&S originally requested, but the current record does not permit the court to determine the exact amounts. An exclusive remedy provision in the 2/5/98 Agreement precludes any recovery for breach of some of the warranty provisions relied upon by Illinois Power, so the court enters summary judgment in favor of DE&S to the extent Count II depends on those warranty provisions.

A. Compensation Paid

DE&S's primary argument is that damages on each claim must be limited to the compensation paid to DE&S for its work on the relevant contract. This argument is based on two parallel provisions, one in each of the February 1998 contracts:

> DE&S' total cumulative liability for claims of any kind whether based on contract, tort (including [*6] negligence and strict liability), under any warranty or otherwise, for any loss or damage relating to this agreement or the performance of the services shall in no case exceed the compensation paid to DE&S from any liability in excess of such amount.

(2/5/98 Agreement, at D017653.)

> Contractor's total cumulative liability for claims of any kind, whether based on contract, tort (including negligence and strict liability), under any warranty or otherwise, for any loss or damage relating to this contract or the performance of the work, shall in no case exceed the compensation paid to Contractor for such work, and Owner hereby releases Contractor from any liability in excess of such amount.

(2/11/98 Agreement, at D017365 (capitalization adjusted).) [1]

> 1 Illinois Power suggests that first provision may have been superseded when the parties entered into the contract containing the second. Because this dispute goes to the amount of damages recoverable, not to the logically prior question of whether any damages cap of this form is valid under Illinois law, it is considered *infra* Section II.A.3.

[*7] 1. *The Indemnification Act*

In response, Illinois Power argues first that these limitation-of-liability provisions are void under section 1 of the Illinois Construction Contract Indemnification for Negligence Act (the "Indemnification Act" or "Act"):

> With respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, highway bridge, viaducts or other work dealing

> with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable.

*740 ILCS 35/1* (West 1993).

The parties do not dispute that both contracts deal with construction, but DE&S contends that this species of provision is not an "agreement to . . . hold harmless." *Id.* A hold-harmless agreement is equivalent to an exculpatory clause and completely insulates a party from liability, DE&S proposes, whereas a limitation-of-damages provision merely caps a party's liability at an agreed level. One of the cases relied upon by DE&S to support [*8] this proposition, however, expressly holds that a provision limiting damages to the "amount paid" under the contract is an exculpatory clause. *Rueben H. Donnelley Corp. v. Krasny Supply Co., 227 Ill. App. 3d 414, 592 N.E.2d 8, 10-11, 169 Ill. Dec. 521 (Ill. App. Ct. 1991).* More fundamentally, none of the cases DE&S cites on this point actually interprets the phrase "hold harmless" as used in the Indemnification Act. The Illinois Appellate Court has repeatedly stated that "[a] contract which purports to relieve a tortfeasor of *some or all* of its liability, premised upon its own negligence, cannot stand in light of the Act." *Lavelle v. Dominick's Finer Foods, Inc., 227 Ill. App. 3d 764, 592 N.E.2d 287, 291, 169 Ill. Dec. 800 (Ill. App. Ct. 1992)* (emphasis added); *Motor Vehicle Cas. Co. v. GSF Energy, Inc., 193 Ill. App. 3d 1, 549 N.E.2d 884, 889, 140 Ill. Dec. 233 (Ill. App. Ct. 1989)*; *accord Stiffle v. Marathon Petroleum Co., 876 F.2d 552, 559 (7th Cir. 1989).* But even if DE&S's proposed distinction were valid, the relevant contractual provisions foreclosed the possibility of Illinois Power recovering *any* [*9] damages from DE&S until Illinois Power first paid compensation to DE&S. The provisions therefore constituted "hold harmless" agreements at conception, as DE&S would interpret that phrase. In the first weeks of the contract, DE&S had zero liability for harm it may have negligently inflicted on Illinois Power. [2]

> 2 This distinguishes two cases relied upon by DE&S, *Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195 (3d Cir. 1995)*, and *Marbro, Inc. v. Borough of Tinton Falls, 297 N.J. Super. 411, 688 A.2d 159 (N.J. Super. 1996)*, in which the relevant contractual clauses provided for substantial damages before any consideration had been paid.

A finding in favor of Illinois Power would seem to follow ineluctably, but ending the analysis here would overlook several important points: two implicit limitations on the Act and a more basic principle of Illinois tort law. Although this court ultimately rests its holding on the tort law doctrine, the statutory limitations are important and [*10] help to situate Illinois Power's other policy arguments. The Illinois Supreme Court recently had occasion to consider the purposes of the Act:

> "It is generally known that indemnity and hold-harmless agreements are most widely used in the construction industry. The legislature in enacting section 1 may have considered that the widespread use of these agreements in the industry may have removed or reduced the incentives to protect workers and others from injury. * * * The statute would thwart attempts to avoid the consequences of liability and thereby insure a continuing motivation for persons responsible for construction activities to take accident prevention measures and provide safe working conditions." *Davis [v. Commonwealth Edison Co., 61 Ill. 2d 494, 336 N.E.2d 881, 884 (Ill. 1975).*
>
> The purposes of the Indemnification Act were again examined in *Capua [v. W. E. O'Neil Constr. Co., 67 Ill. 2d 255, 367 N.E.2d 669, 10 Ill. Dec. 216 (Ill. 1977).* There, sections 1 and 3 of the Act were harmonized. Section 3 provides that the Act "does not apply to construction bonds or insurance contracts or agreements." *740 ILCS 35/3* (West 1994). [*11] In *Capua*, this court confirmed the legislative purpose set forth in Davis and further determined that section 3 deals with an additional protective interest--the interest of construction workers, as well as members of the general public who sustain construction related injuries, in supplemental sources of compensation. *Capua*, 367 N.E.2d at 671-72. *Davis* and *Capua* demonstrate that as a matter of public policy, courts will not enforce promises to indemnify contained in construction contracts because their dominant aspect is the disincentive for the indemnitee to exercise care.

*Braye v. Archer-Daniels-Midland Co., 175 Ill. 2d 201, 676 N.E.2d 1295, 1303, 222 Ill. Dec. 91 (Ill. 1997).*

This explanation of the Act demonstrates why DE&S misses the mark with its argument that DE&S is not being held "harmless" because it would remain potentially liable for over $ 10 million in damages even if these limitation clauses are enforced. As the Illinois Supreme Court explains, the purpose of the Act is to ensure that the party with control over construction work has a continuing incentive, derived from its potential liability for negligence, [*12] to exercise due care. Before DE&S was paid compensation under the contract, such an incentive was lacking. The effect of a contractual provision on the parties' incentives must be evaluated ex ante, not ex post. But the policy motivating the Act is helpful to DE&S in another way.

The ultimate goal of the Act, it appears, is to protect construction workers and the general public. One might plausibly infer that the Act applies only where the interests of third parties are at stake. The Fifth District of the Illinois Appellate Court appeared to adopt this construction in *Ralph Korte Construction Co. v. Springfield Mechanical Co., 54 Ill. App. 3d 445, 369 N.E.2d 561, 12 Ill. Dec. 64 (Ill. App. Ct. 1977)*: "The agreement, as here applied, does not remove or reduce any incentives to protect workers and others from injury since it does not involve any question of liability to a third party." *Id. at 562*. This interpretation of the Act would favor enforcement of the hold-harmless provisions at issue here because no non-parties to the contracts were affected.

However, a subsequent case from the First District reads *Ralph Korte* as limited to instances in which the parties [*13] waive their rights against each other only to the extent they are covered by property insurance. *Modern Steel Treating Co. v. Liquid Carbonic Indus./Med. Corp., 232 Ill. Dec. 619, 698 N.E.2d 710, 714 (Ill. App. Ct. 1998)*; *see also Intergovernmental Risk Mgmt. v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc., 295 Ill. App. 3d 784, 692 N.E.2d 739, 229 Ill. Dec. 750 (Ill. App. Ct. 1998)*. The First District did not justify this limitation, and this court perceives no reason under the Act to distinguish between cases of self-insurance and insurance through an independent carrier. Contracting parties are generally free to assign among themselves the risks of insolvency. At bottom, *Modern Steel* rests on a broader notion of whom the Act was designed to protect. Construction is so inherently risky, the court apparently reasoned, that parties to construction contracts may not assign among themselves the risks of harm to themselves (without limiting such a reassignment to insurance proceeds).

This court strongly suspects, based on *Davis*, *Capua*, and *Braye*, that the Illinois Supreme Court would decline to follow the First District's reading [*14] of the Indemnification Act. *Cf. Hess Oil Virgin Islands Corp. v. UOP, Inc., 861 F.2d 1197, 1207 (10th Cir. 1988)* (applying Illinois law) (holding that contractual provision waiving right to recover for business interruption and lost profits did not violate the Act because "the limitation clause in no way restricts UOP's responsibilities to workers or the public which the statute concerns"). In light of *Modern Steel*, however, this court would rather not rest its holding on this prediction. *Cf. Allen, 128 F.3d at 466* ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently.").

An alternative implicit limitation on the Act is consistent with both the purposes of the Act and, as far as this court is aware, all of the case law. Not every indemnification or hold-harmless agreement in a construction contract is unenforceable. Rather, the Act voids only those agreements that reduce the incentive to avoid construction-related injuries. *Cf. Braye, 676 N.E.2d at 1303* ("construction [*15] related injuries"). This principle holds whether the injured person is a construction worker, a member of the general public, or (assuming the First District got it right in *Modern Steel*) a party to the contract. Two cases illustrate.

In *Lovellette v. Southern Railway Co., 898 F.2d 1286 (7th Cir. 1990)*, a property owner, in return for a fee, had given another company permission to build and maintain a sewer pipe on the owner's property. The licensee erected a fence around the pipe, which was the proximate cause of personal injuries sustained by third parties. When the injured parties sued the owner, the owner sought indemnity from the licensee under an indemnity provision in the license. The licensee defended on the theory that the indemnity clause was void under the Act. The Seventh Circuit rejected this defense, inferring from the purposes of the Act that

> the indemnitee must be in a position to avoid negligence or, viewed from a different perspective, to cause harm negligently in construction activities. In other words, where an indemnitee has merely accommodated the indemnitor and the indemnitee does not assume responsibility for any construction activities, [*16] the operation of the statute is not triggered. It is not enough . . . that the indemnitee sign an agreement somehow connected with construction activity.

*Id. at 1290.* Of course, unlike the indemnitee in *Lovellette*, DE&S was in a position to negligently cause harm in construction activities. The broader lesson of *Lovellette*, however, is that courts do not apply the Act mechanically to void all indemnity agreements in all contracts related to construction, but rather examine whether applying the Act in a particular case will serve its ends.

A more directly applicable case is *North River Insurance Co. v. Jones, 655 N.E.2d 987 (Ill. App. Ct. 1995)*. There, the First District held that because "the Act is intended and serves to protect construction workers . . . and the public as well from the dangers associated with construction work," the Act did not void a limitation-of-damages clause in a fire alarm system contract as applied to damages incurred "after installation of [the] alarm system is completed." *Id. at 991.* By negative implication, if the damages had occurred during the installation of the alarm system--for example, [*17] when a worker installing a smoke detector fell off a ladder--then the Act presumably would have applied and voided the limitation-of-damages clause. The type and timing of the harm, not the nature of the contract, determines the applicability of the Act. The critical question is whether enforcing the contractual provision would reduce the incentive to avoid "dangers associated with construction work." *Davis*, 336 N.E.2d at 884. An alarm system failing after installation is not one of these harms, but personal and property injuries sustained during installation would be.

This reading of the Act is consistent with the holding of *Modern Steel.* There, the relevant contract was for the installation of a control panel to regulate the atmosphere in a furnace. 698 N.E.2d at 351-52. While construction work was still on-going (the court made a point of observing), the furnace exploded, inflicting substantial property damage. *Id. at 353.* Clearly, this event was a danger associated with construction. In contrast, the risk that one party to a contract will negligently misrepresent its ability to perform by a certain date or fail to meet its duty [*18] of competence is not a danger unique to construction work. For that reason, the Act would not void the hold-harmless clauses in the case at bar.

The use of the subjective verb tense in the prior sentence is intentional. What the parties mysteriously overlook is the fact that Illinois Power fails to state a claim for negligence. The only damages claimed by Illinois Power for DE&S's negligent misrepresentations are the amount of money paid to DE&S under the contract and consequential damages. In essence, Illinois Power seeks to recover for its disappointed business expectations. These damages represent pure economic loss. *See Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443, 449, 61 Ill. Dec. 746 (Ill. 1982)*. A plaintiff can recover economic loss for negligent misrepresentations only if the defendant "is in the business of supplying information for the guidance of others in their business transactions." *Id. at 452.* No such allegation appears in Illinois Power's complaint. *See Analysts Int'l Corp. v. Recycled Paper Prods., Inc.*, No. 85 C 8637, *1987 U.S. Dist. LEXIS 5611*, at *16 (N.D. Ill. June 19, 1987) (granting summary judgment [*19] to defendant on negligent misrepresentation claim where defendant was not alleged to be in the business of supplying information). But even if providing pre-contractual proposals were deemed to be part of DE&S's business, the information provided here was incidental to a tangible product, the degraded voltage project, and could have been memorialized in contractual terms. *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 176 Ill. 2d 160, 679 N.E.2d 1197, 1201-02, 223 Ill. Dec. 424 (Ill. 1997)* (affirming dismissal of negligent misrepresentation claim seeking economic loss damages against engineer because representations were incidental to a tangible product, the construction project). Recovery must therefore be in contract, not tort.

A case on all fours is *Union Oil Co. v. John Brown E&C*, No. 94 C 4424, *1994 U.S. Dist. LEXIS 13930* (N.D. Ill. Sept. 26, 1994). There, the plaintiff alleged that the defendant "negligently misrepresented that it could complete the project for the sum of $ 46,900,000, that it could complete the project on time, and that it could complete the project without defects and in a workmanlike manner." *1994 U.S. Dist. LEXIS 13930* at *11. The court [*20] held that the economic-loss doctrine barred recovery on this claim, explaining that "Illinois courts have repeatedly held that when the only information proffered by a defendant relates to the goods or services to be provided by the defendant, the defendant is not deemed to be in the business of providing information for the guidance of others and is not liable for negligent misrepresentation." *1994 U.S. Dist. LEXIS 13930* at *12. Similarly, Illinois Power's negligent misrepresentation claim is dismissed.

Illinois Power's inability to state a claim for negligence removes this case from the Act's sphere of influence. The Act applies only to agreements that indemnify or hold harmless a person from that person's "own negligence." *740 ILCS 35/1.* As just explained, the negligent misrepresentation claim is gone. Because the breach of contract and breach of warranty claims do not sound in negligence, the Act is not applicable to those claims either.

2. *Public Policy*

Illinois Power's second line of attack on the limitation-of-liability provisions is public policy. In Illinois, "public policy strongly favors freedom to contract." *McClure Eng'g Assocs., Inc. v. Reuben H. Donnelley*

*Corp., 447 N.E.2d 400, 402 (Ill. 1983)*. [*21] "Regarding contracts that shift the risks of one's own negligence to another contracting party, the general rule is to enforce exculpatory contracts unless . . . it would be against a settled public policy of the State to do so . . . ." *Harris v. Walker, 119 Ill. 2d 542, 519 N.E.2d 917, 919, 116 Ill. Dec. 702 (Ill. 1998)*. Illinois Power argues that public policy prohibits the enforcement of an exculpatory clause in a contract involving a public utility, although it admits that no published Illinois decision limits a public utility's right to bargain away its legal remedies. This admission alone strongly suggests that enforcement would not offend a "settled" public policy of Illinois.

In search of indirect support for its argument, Illinois Power marshals the following quotations from two cases. "The decisions of this court have consistently reflected a judicial concern with balancing the need to respect the right to freely contract with the need to protect parties from unfair provisions in contracts involving publicly regulated activities." *McClure, 447 N.E.2d at 402-03*. "Exculpatory agreements that are contrary to public policy include those . . [*22] . between the public and those charged with a duty of public service, such as involving a common carrier, an innkeeper, a public warehouseman or *a public utility* . . . ." *White v. Village of Homewood, 256 Ill. App. 3d 354, 628 N.E.2d 616, 619, 195 Ill. Dec. 152 (Ill. App. Ct. 1993)* (emphasis added).

As DE&S aptly observes, however, the court's concern in each instance was protecting the public from the regulated entity's exculpatory clause, not protecting the regulated entity. Indeed, the only two cases cited by the Illinois Supreme Court in support of the quoted passage from *McClure* that decline to enforce exculpatory clauses on public policy grounds involve clauses *favoring* the entity with duties to the public. *See Chicago & N.W. Ry. Co. v. Chapman, 133 Ill. 96, 24 N.E. 417, 418 (Ill. 1890)* (common carrier); *Tyler, Ullman & Co. v. W. Union Tel. Co., 60 Ill. 421, 432 (1871)* (telegraph company). These cases make clear that the policy at stake is protecting the public. *See, e.g., Tyler, 60 Ill. at 432* ("It is the settled doctrine of this court that a railroad company can not purchase exemption from gross negligence, [*23] or protect itself against such; that it would be against public policy so to contract. We see no reason why the rule should not be the same in regard to telegraph companies, for they are, like railroads, public institutions, having duties to perform to the public."). What is more, a third case cited in *McClure* directly undermines Illinois Power's position. In *Sweney Gasoline & Oil Co. v. Toledo, Peoria & W. R.R. Co., 42 Ill. 2d 265, 247 N.E.2d 603, 605 (Ill. 1969)*, the court enforced an exculpatory clause in favor of a railroad against a lessee, notwithstanding the fact that the railroad was a publicly regulated entity. Sweney is inconsistent with the notion that exculpatory clauses are automatically unenforceable where one party to the relevant contract is a public entity. *Cf. Rosenstein v. Standard & Poor's Corp., 264 Ill. App. 3d 818, 636 N.E.2d 665, 672, 201 Ill. Dec. 233 (Ill. App. Ct. 1993)* ("Even where a semi-public nature is found to permeate the transaction between the parties, the exculpatory clause will be recognized.").

Setting aside the case law, Illinois Power's policy argument is unsound. The argument is that if a contractor like [*24] DE&S is able to avoid the costs of its own negligence and breach of contract, then the public utility will be forced either to pass these costs on to the consumer in the form of higher rates or to bear the costs itself by reducing capital improvements. Either option is bad for the public, Illinois Power contends. This ex post analysis overlooks an obvious point: if exculpatory agreements were unenforceable, contractors would demand higher compensation before subjecting themselves to unlimited liability. In all likelihood, some contractors would not be willing to work at all under such terms. *Cf. Gillespie v. City of Indianapolis, 185 F.3d 693, 702 (7th Cir. 1999)* (explaining that without a statutory limitation of liability, "some vital participants in the construction of nuclear plants--including architects, engineers, and smaller manufacturers of component parts--would likely have withdrawn from the industry"). If it is truly in the public interest that all contractors on public utility jobs be subject to unlimited liability, then the utilities will insist on such a term in their contracts. They do not need any help from the courts.

Next, Illinois Power argues that [*25] "overriding public policy concerns for nuclear safety" render unenforceable the damage limitation clauses. (Resp. at 9.) Limiting liability, the argument goes, will reduce the incentive to exercise due care below the level acceptable in the nuclear power industry. Congress apparently disagrees. The Indemnification and Limitation of Liability Act, *42 U.S.C. § 2210*, limits the liability of those who participate in the construction of nuclear power plants in order to reduce the cost of such construction. Illinois Power cites no case to support the view that, as a matter of public policy, contractual exculpatory clauses are *per se* void in the nuclear power industry. The only relevant case this court has found rejects that argument. *See Portland Gen. Elec. Co. v. Bechtel Corp., No. 79-103, 1980 U.S. Dist. LEXIS 9712*, at *16-17 (D. Or. June 4, 1980). The court similarly rejects the proposition that *any* incremental reduction in the incentive to exercise due care in this industry is *per se* unacceptable on public policy grounds.

Illinois Power's third policy argument, also devoid of any direct case law support, is that engineers, like doctors, [*26] lawyers, and real estate brokers, are not

permitted to limit their liability for professional services. "Because Illinois law imposes the duty of care upon professional engineers, DE&S' attempt to [limit] their [sic] liability for a statutory duty is void as against public policy." (Resp. at 11.) Illinois Power cites *Cerney Pickas & Co. v. C.R. Jahn Co., 347 Ill. App. 379, 106 N.E.2d 828 (Ill. App. Ct. 1952)*, for its premise that a "person cannot exempt himself from violation of [a] duty imposed by ordinance." (Resp. at 11.) Illinois Power would do well to read the subsequent history of the cases it cites. After remand, the Illinois Supreme Court reversed the appellate court decision and expressly rejected the relevant proposition of law. *See Cerney Pickas & Co. v. C.R. Jahn Co., 7 Ill. 2d 393, 131 N.E.2d 100, 102 (Ill. 1955)* ("That one of the grounds of negligence charged in this case was the lessee's failure to comply with the building ordinances in making alterations in the building is not, we think, of controlling significance" in determining the enforceability of an exculpatory clause.). [3]

3 The Illinois Appellate Court similarly ignored the subsequent history of *Cerney Pickas* in *Zimmerman v. Northfield Real Estate, Inc., 156 Ill. App. 3d 154, 510 N.E.2d 409, 415-16, 109 Ill. Dec. 541 (Ill. App. Ct. 1986)* (holding that real estate agents cannot contractually avoid liability for negligence). Whether or not this error infects the holding of *Zimmerman*, real estate brokers, unlike engineers, have fiduciary duties toward their clients.

[*27] While no court applying Illinois law has addressed the question of whether public policy prevents an engineer from contractually limiting his liability to another party to the contract, the weight of authority from other jurisdictions suggests that an engineer can do so. *See Georgetown Steel Corp. v. Law Eng'g Testing Co., 7 F.3d 223* (table), *1993 U.S. App. LEXIS 23541*, at *8 n.3 (4th Cir. Sept. 14, 1993); *Rogers v. Parish Corp.*, No. 5:92:CV:101, *1993 U.S. Dist. LEXIS 13162*, at *9-12 (W.D. Mich. Aug. 30, 1993); *R-1 Assocs. v. Goldberg-Zoino & Assocs.*, No. 91-7417- *E, 1995 Mass. Super. LEXIS 395*, at *11-15 (Mass. Super. Aug. 16, 1995); *see also Cent. Hudson Gas & Elec. Corp. v. Combustion Eng'g, Inc., No. 86 Civ. 3061, 1989 U.S. Dist. LEXIS 8509*, at *12-14 (S.D.N.Y. July 26, 1989) (enforcing damage limitation clause in favor of engineer without discussion of public policy); *Long Island Lighting Co. v. Imo Delaval, Inc., 668 F. Supp. 237, 244 (S.D.N.Y. 1987)* (same); *Sear-Brown Group v. Jay Builders, Inc., 244 A.D.2d 966, 665 N.Y.S.2d 162, 163 (N.Y. App. Div. 1997)* (same); *cf. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 675 A.2d 209, 215 (N.J. 1996)* [*28] (holding that exculpatory clause did not protect engineer with contractual responsibility for the progress of the work and knowledge of hazardous conditions from liability for death of a construction worker).

This court does not believe that the Illinois Supreme Court would adopt a *per se* rule against engineers contractually limiting their liability to another contracting party. Unlike doctors, lawyers, and real estate brokers, engineers are not fiduciaries for their clients. To be sure, clients rely on engineers' professional judgment and mistakes can affect the safety of clients and others. The Illinois legislature presumably recognized these risks when it enacted the Indemnification Act. To the extent engineering work results in construction-related damage to third parties, injured parties are clearly protected by the Act. As explained above, however, the Act does not cover the case at bar. In the absence of some indication that public policy in Illinois goes further than the Act, this court will not extend the prohibition on exculpatory clauses to all contracts involving engineers. That Illinois licenses engineers is also not convincing evidence that exculpatory clauses violate [*29] public policy. The regulating authority can enforce an engineer's statutory duties with or without a private cause of action. Illinois Power is a sophisticated party and could have negotiated for unlimited liability. Its decision not to do so will be respected.

Finally, Illinois Power asserts that "otherwise enforceable exculpatory provisions are not effective as to 'reckless or intentional breaches [of contract] or those committed in bad faith.'" (Resp. at 11 (quoting *Jewish Hosp. v. Boatman's Nat'l Bank, 261 Ill. App. 3d 750, 633 N.E.2d 1267, 1280, 199 Ill. Dec. 276 (Ill. App. Ct. 1994)*.) Illinois Power's creative insertion notwithstanding, *Jewish Hospital* involved claims for negligence and breach of fiduciary duty, not breach of contract or warranty. That a breach of contract may be reckless or intentional is generally of no legal significance. *Cf. Morrow v. L.A. Goldschmidt Assocs., Inc., 112 Ill. 2d 87, 492 N.E.2d 181, 185-86, 96 Ill. Dec. 939 (Ill. 1986)* ("We cannot agree that a breach of contract becomes a tort just because the breach was wilful and wanton."); *Vail v. Bd. of Educ., 706 F.2d 1435, 1456 (7th Cir. 1983)* [*30] (Posner, J., dissenting) ("Breach of contract is a strict-liability concept."), *aff'd by equally divided court*, 466 U.S. 377 (1984). This court is aware of no Illinois case holding that, absent fraud, an exculpatory clause does not cover an intentional breach of contract. It is worth noting that DE&S invokes the limitation-of-liability provisions only with respect to its breach of contract and breach of warranty claims. Thus, Illinois Power's fraudulent misrepresentation and deceptive trade practices claims, derived from essentially the same facts, will be unaffected.

3. *Amount of "Compensation Paid"*

Based on the affidavit of Larry Davis, DE&S asserts that Illinois Power paid DE&S $ 189,480 for its work under the 2/5/98 Agreement and $ 10,691,608 for its work under the 2/11/98 Agreement. (Rule 56.1(a)(3) Statement P 11.) These amounts do not include direct costs of travel expenses and subcontractor fees. (Def.'s App. Tab E, P 5.) In response, Illinois Power argues that its payments cannot be separated into two parts, but were made pursuant to a single agreement. Illinois Power cites only the first page of a November 1997 project plan to support this argument. [*31] (Def. App. Tab A, at D016681.) The plan does indicate that the scope of the degraded voltage project was to include both DE&S's direct engineering work and its construction subcontractor and procurement oversight responsibilities. An attachment to the plan indicates that both a "procurement agreement" and a "contract for this project" were at that time "being negotiated between Illinois Power and DE&S." (*Id.* at D016704.) The plan does not appear to be a contract between Illinois Power and DE&S and suggests that two separate, although obviously related, contracts still under negotiation would govern the parties' relationship in the future.

The language of the agreements supports DE&S's position that the compensation it received (at least after the contracts became effective) can be parsed between the two agreements. Each contract includes an "entire agreement" clause purporting to supersede all prior understandings with respect to the subject matter of the contract. (2/5/98 Agreement, at D017670; 2/11/98 Agreement, at D017361.) In light of these integration clauses, Illinois Power cannot rely on the November 1997 project plan to inform interpretation of the two contracts. The 2/5/98 Agreement [*32] purports to be a "Program Manager's Agreement" and focuses exclusively on DE&S's project management duties. (D017654-55.) The 2/11/98 Agreement, on the other hand, does not specifically define DE&S's responsibilities and appears to be a "consulting engineering services" agreement between Illinois Power and DE&S. (D017350.) Because the two contracts deal with different subject matter, the court rejects Illinois Power's suggestion that the later agreement superseded the earlier one. [4]

4 Until DE&S raised the damages limitation issue, Illinois Power appeared to agree that the earlier agreement survived. The amended complaint quotes extensively from the 2/5/98 Agreement. (Am. Compl. P 22.)

It does not necessarily follow, however, that damages for claims arising from each contract should be capped at the amount of compensation paid under that contract. This depends on the text of the contracts. Illinois Power argues that the term "compensation paid"

under the 2/5/98 Agreement should include compensation paid for [*33] *all* services DE&S performed, not just for services rendered under that agreement. In support of this interpretation, Illinois Power emphasizes the second half of the phrase "relating to this agreement or the performance of the services." The provision, however, does not refer to "any services" or "all services," but to "the services." In context, this court believes that the only sensible way to read this phrase is as limited to the services rendered under the 2/5/98 Agreement. There would be no principled basis on Illinois Power's proposed reading to exclude services rendered by DE&S on a totally unrelated project. Without clearer contractual language, this court will not infer such a bizarre result.

Relying only on the quoted language, the strongest counter-argument is that the narrow interpretation renders superfluous the phrase "or the performance of the services." All services performed under the agreement, the argument goes, are related to the agreement and therefore covered by the first half of the disjunctive phrase. But the premise is not necessarily true. One might read the phrase "relating to this agreement" as limited to events surrounding contract formation, rather [*34] than performance. Thus, the phrase "or performance of the services" makes clear that the damages cap covers liability arising both from formation and from performance.

A better, but also unconvincing, textual argument for Illinois Power's proposed reading is based on a comparison of the two contracts. The 2/5/98 Agreement limits damages to "the compensation paid to DE&S," whereas the 2/11/98 Agreement limits damages to "the compensation paid to Contractor for such work," which in context apparently refers to work anticipated or performed under that contract. The omission of the phrase "for such work" arguably indicates an intention to include compensation paid to DE&S for *all* work. Of course, the 2/5/98 Agreement came first, so it is somewhat awkward to describe the phrase as having been omitted. Timing is not the only reason to think that the omission was unintentional. The parties--perhaps in the process of replacing the standard form "Contractor" with "DE&S"--appear to have inadvertently deleted the immediately adjacent phrase "for such services, and Owner hereby releases Contractor . . . ." What is left is the nonsensical "compensation paid to DE&S [] from any liability [*35] in excess of such amount." This scrivener's error will not be construed to indicate an intent to trump the more natural reading of "compensation paid" as limited to compensation paid under the 2/5/98 Agreement.

Illinois Power raises two objections to the compensation totals provided by DE&S. It succeeds at least in part on both fronts, but neither objection precludes partial summary judgment. First, Illinois Power argues that

all expenses for construction should count toward the liability cap. The 2/11/98 Agreement defines "compensation" to include "personnel charges and reimbursable expenses" for time and work under the contract. (2/11/87 Agreement, at D017350.) "Subcontractors and Retained Contractors" is a subsection under compensation. (*Id.* at D017352.) It is undisputed that through February 1998 Illinois Power reimbursed DE&S for construction subcontracting. Thus, under the terms of the contract, these payments constitute "compensation paid" for purposes of calculating the liability cap. On the other hand, it is undisputed that Illinois Power removed the construction work from DE&S's direct responsibility after February 1998 and no longer reimbursed it for any construction [*36] work. Whether or not Illinois Power was, as it claims, mitigating its damages by taking direct control over the construction work, the amounts paid to third parties cannot be deemed "compensation paid" to DE&S.

Second, Illinois Power asserts that staff augmentation costs should count toward the liability cap. This assertion is valid. The 2/11/98 Agreement specifically includes staff augmentation costs as an element of compensation. (*Id.* at D017352.) Dictionary definitions and DE&S's proposed distinction between payment and reimbursement cannot overcome the clear terms of the contract. [5] The total liability cap for claims under the 2/11/98 Agreement will include staff augmentation and construction subcontracting costs actually received by DE&S.

5 To the extent there may be any ambiguity, it would be interpreted against DE&S, as the beneficiary of an exculpatory clause. *See Harris, 519 N.E.2d at 919.*

Thus, DE&S's liability for breach of contract and breach of warranty claims based on the [*37] 2/5/98 Agreement and the 2/11/98 Agreement will be limited to the amount of compensation paid to DE&S under the relevant contract. On the current record, however, the court is unable to provide exact dollar amounts. In its reply brief, DE&S asserts that the total amount paid to DE&S under both contracts was $ 12,924,555.26. This figure does not appear in DE&S's statement of facts and is not attested to by affidavit. In addition, DE&S fails to divide the "expenses" category between the two agreements.

B. Consequential Damages

In Count I, Illinois Power seeks consequential damages for breach of contract. The February agreements, however, expressly absolve DE&S from liability for consequential damages. (2/5/98 Agreement, at D017653; 2/11/98 Agreement, at D017365.) Illinois Power contends that these provisions are unenforceable under Illinois law for all of the same reasons it marshaled against the "compensation paid" provisions. The reasons fare even worse in this milieu. The Tenth Circuit, applying Illinois law, has expressly rejected the view that a clause barring consequential damages is void by operation of the Indemnification Act. *Hess Oil, 861 F.2d at 1207.* [*38] Illinois courts in upholding no-consequential-damages clauses have relied on the fact that such provisions, unlike hold-harmless clauses, do not eliminate recovery altogether. *See, e.g., Rayner Covering Sys., Inc. v. Danvers Farmers Elevator Co., 226 Ill. App. 3d 507, 589 N.E.2d 1034, 1038, 168 Ill. Dec. 634 (Ill. App. Ct. 1993).* To the extent Count I alleges breach of the 2/5/98 and 2/11/98 Agreements, consequential damages are barred.

C. Breach of Warranty

DE&S argues that Illinois Power's exclusive remedy for breach of warranty under the 2/5/98 Agreement is an equitable adjustment in the compensation paid or to be paid to DE&S. This argument is based on the "Warranty" paragraph of the 2/5/98 Agreement, which, after outlining several specific duties of DE&S, provides:

> DE&S makes no other warranties or representations, whether statutory, expressed or implied (including implied warranties of merchantability and fitness for a particular purpose). The sole liability of DE&S relating to the services shall be limited to reperforming at DE&S' expense any services performed by DE&S which have failed to meet the above warranty . . . . In the event that reperformance [*39] is impracticable, DE&S may, in its sole discretion, make an equitable adjustment in the compensation paid, or to be paid to DE&S by owner, for DE&S' failure to meet its warranty obligations hereunder. The foregoing remedies shall be owners sole remedies for any failure of DE&S to comply with its warranty obligations.

(2/5/98 Agreement P 19.3, at D017664.) Delays are addressed in a later paragraph, in which "DE&S warrants its expertise in maintaining schedules for assigned work and will recognize events likely to cause delay." (*Id.* P 28.1, at D01768.) That paragraph goes on to provide that DE&S will promptly notify Illinois Power of any expected delay and submit claims for schedule extensions.

Neither party cites any case law addressing the enforceability of this type of contract provision. This court sees no reason why it should be deemed *per se* unen-

forceable. DE&S could have made no warranty at all--there was plenty of other consideration in the contract--which would amount to the same thing as limiting damages to zero for breach of warranty. But the warranties here were better than nothing: where reperformance was practical, DE&S committed itself to reperforming [*40] at no charge to Illinois Power. Here, reperformance is impossible, so Illinois Power's exclusive remedy for breach of its duties under the warranty paragraph is requesting a wholly discretionary compensation adjustment from DE&S. To the extent Count II depends on paragraph 19 of the 2/5/98 Agreement, summary judgment in favor of DE&S is entered.

Delay and scheduling failures stand on a different footing. This court concludes that the damages provided for in paragraph 19 apply only to the warranties outlined in that paragraph. Several aspects of the contract lead to this conclusion. Most fundamentally, reperformance for delay is never possible, so much of paragraph 19 is inapplicable by its plain terms. It seems implausible to suppose that Illinois Power would demand assurances concerning scheduling and then agree to a wholly discretionary remedy for delay. Paragraph 19 is titled "Warranty," the first two sub-paragraphs address duties of competence, care, and professionalism, and the exclusive remedy provision in sub-paragraph 19.3 refers at one point to "the above warranty." Paragraph 28, entitled "Delay," appears seven paragraphs and four pages later. The logic, language, and structure [*41] of the contract dictate that the exclusive remedy provision for breach of warranty is limited to the warranties described in paragraph 19. [6] Accordingly, to the extent Count II depends on paragraph 28 of the 2/5/98 Agreement, summary judgment in favor of DE&S is denied and damages will be capped at the amount of compensation paid under the 2/5/98 Agreement. [7]

6 Even if the court found an ambiguity concerning the scope of the exculpatory clause, the court would be constrained to interpret the clause narrowly. *See Harris, 519 N.E.2d at 919.*

7 This is not necessarily the upper limit of Illinois Power's potential recovery for breach of warranty. Although Illinois Power does not expressly rely on the 2/11/98 Agreement in support of its breach of warranty claim, DE&S in that contract "warrants that its services shall be performed . . . with professional thoroughness and competence." (D017362.) Illinois Power's allegations arguably support recovery for breach of this provision.

**III.** [*42] **Conclusion**

For the foregoing reasons, Count V is dismissed, damages under Counts I and II are limited to the compensation paid to DE&S under the February contracts, and judgment in favor of DE&S is entered as to Count II to the extent that count is based on paragraph 19 of the 2/5/98 Agreement.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: March 29, 2002



**BRANDON THOMPSON, a minor, by his Mother and Next Friend, DEBRA CHRISTOPHER, Plaintiff, v. PIZZA HUT OF AMERICA, INC. a Delaware Corporation, Defendant and Third Party Plaintiff, v. NORAND CORPORATION, an Iowa corporation, and COKER SERVICE, INC. an Illinois corporation, Third Party Defendants.**

**No. 89 C 6496**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 8701*

**June 17, 1992, Decided**
**June 18, 1992, Docketed**

**JUDGES:** [*1] Zagel

**OPINION BY:** JAMES B. ZAGEL

**OPINION**

HONORABLE JAMES B. ZAGEL

*MEMORANDUM OPINION AND ORDER*

In this diversity action, Plaintiff Brandon Thompson, a minor, brought suit through his mother, Debra Christopher, against Pizza Hut of America, Inc. Thompson seeks damages for injuries allegedly suffered *in utero* due to defendant's negligence. In turn, Pizza Hut filed a third party complaint against Norand Corporation seeking contribution and indemnification. Before this Court is Norand's motion to dismiss Count II of the amended third party complaint in which Pizza Hut seeks indemnification from Norand. For the reasons set forth below we grant Norand's motion to dismiss.

**FACTS**

On September 24, 1984, Norand and Pizza Hut entered into an agreement whereby Norand agreed to computerize the cash registers at Pizza Hut restaurants. The agreement provided that Norand would both supply and install the necessary equipment for computerization. In November 1984, Norand installed the equipment at the Pizza Hut located in Zion, Illinois, where Christopher worked as an assistant manager. During the installation, Pizza Hut's ventilation system failed and over a period of three days Christopher was allegedly [*2] exposed to carbon monoxide produced by the restaurant's gas ovens. On August 3, 1985, Thompson was born with severe birth defects.

Thompson alleges that his injuries were a direct and proximate result of his mother's exposure to carbon monoxide. He seeks damages from Pizza Hut due to its alleged negligence in failing to repair the ventilation system and operating the restaurant despite the dangerous conditions. Pizza Hut's contention, which must be accepted as true for the purposes of this motion, *Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir. 1990)*, is that Norand employees damaged the restaurant's duct work during the course of their installation work, and that plaintiff's alleged exposure to carbon monoxide and injuries were directly and proximately caused by Norand employees' negligent acts. Based on an indemnification clause contained in their September 1984 contract, Pizza Hut seeks indemnification from Norand for any judgment rendered against it.

**THE INDEMNIFICATION AGREEMENT**

Paragraph 10 of the 1988 agreement between Pizza Hut and Norand requires Norand to indemnify and hold Pizza Hut harmless "from any and all claims, damages, [*3] losses, judgments, costs or expenses (including reasonable attorney fees) arising from or incurred as a result of action of [Norand] or its officers, agents, employees or subcontractors . . ." The issue is whether this indemnification clause is void against public policy pur-

suant to the Indemnity Act. Ill. Rev. Stat. ch. 29, 761. The Indemnity Act provides:

With respect to contracts or agreements, either public or private, for the construction, alteration, repair, or maintenance of a building structure, highway bridge, viaducts or other work dealing with construction, or for any moving demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold harmless another person from the person's own negligence is void as against public policy and wholly unenforceable.

The indemnity provision at issue only purports to hold Pizza Hut harmless from acts of negligence committed by Norand. Thus, on its face, the indemnification provision does not appear to violate the Indemnity Act. In the original complaint, however, Thompson seeks recovery against Pizza Hut for its own negligence rather than Norand's negligence. Therefore, Pizza Hut's interpretation [*4] of the indemnification agreement would necessarily require Norand to indemnify Pizza Hut for Pizza Hut's own alleged negligence. Such an interpretation is prohibited: "[a] contract purporting to relieve a tortfeasor of some or all of its liability, premised upon its own negligence, cannot stand in light of the Anti-indemnity statute." *Stiffle v. Marathon Petroleum Co., 876 F.2d 552, 559 (7th Cir. 1989).*

Pizza Hut does not argue this point. Instead, Pizza Hut contends that the agreement in question does not pertain to "construction, alteration, repair or maintenance of a building or structure . . . or other work dealing with construction," and, therefore, does not fall within the ambit of the Indemnity Act. We disagree.

The agreement between Pizza Hut and Norand makes clear that installation of the computerized cash registers would not only require installation of the necessary equipment, but altering, or adapting the existing building to allow for the proper utilization of the computers. Specifically, the agreement required Norand to install Fiber Optic cabling in the attics of the Pizza Hut, add electrical outlets, install telephone lines, hang shelves, and [*5] drill holes in the walls, ceilings and countertops of the restaurants for proper ventilation.

The language of the Act is broad and, therefore, should be liberally construed. In this case, at the very least, there has been some "alteration" in the Pizza Hut buildings in that there are wires in the walls and electrical outlets that were not there before installation. Furthermore, an agreement calling for electrical work should be enough in itself to fall within the ambit of the Act. *See e.g. Doran v. Corn Products-U.S., 776 F. Supp. 368 (N.D. Ill. 1991)* (applying the Act to electrical work performed on a pollution control precipitator). Here, Pizza Hut's agreement with Norand expressly required Norand to hire licensed electricians to perform the electrical work, which included adding electrical outlets, converting existing outlets, and installing new isolated circuits.

Pizza Hut places undue reliance on two cases to support its conclusion that their agreement with Norand is not covered by the Indemnity Act. First, pizza Hut cites *Winston Network, Inc. v. Indiana Harbor Belt R.R. Co., 944 F.2d 1352 (7th Cir. 1991)*, in which the court held [*6] that a licensing agreement granting an advertising agency the right to solicit third parties to advertise on the railroad's land was not within the scope of the Act. In *Winston Network,* the court stressed that the agreement in question did "not obligate anyone to engage in activity that is even remotely construction related." *Winston Network, 944 F.2d at 1359.* While it was foreseeable that third party advertisers might paint their billboards on the railroad's property, this connection to construction was "simply too attenuated." *Id.* In contrast, the agreement between Norand and Pizza Hut specifically enumerated the materials needed for a proper installation and the precise work to be performed. Moreover, paragraph 11 of Pizza Hut's agreement with Norand required Norand to supply a bid bond before "commencement of any *construction."*

Pizza Hut also relies on *Fresco v. Haden Uniking Corp.,* No. 84 C 20096, 1990 WL 304198 (N.D. Ill.). There, the court held that a contractor's installation of a "uniprime system" at a Chrysler plant was not covered by the Act. In *Fresco,* however, the court stressed that the facts presented no evidence of any construction [*7] or alteration in the assembly plant "either contemplated or accomplished. . . ." *Id.* at *7. Presumably, had the facts in that case demonstrated an alteration of a building as in the present case, the court would have reached a different result.

The purpose behind the Indemnity Act is to protect construction workers and the general public from the dangers of construction work. *Davis v. Commonwealth Edison Co., 61 Ill.2d 494, 336 N.E.2d 881 (1975).* In *Davis,* the Illinois Supreme Court noted that indemnification agreements reduce the indemnitee's incentive to lessen the extent of danger to workers and the public. *Davis, 336 N.E.2d at 884.* In this case, the underlying complaint alleges in Count II that Pizza Hut knew of the presence of carbon monoxide in its restaurant and that it refused to shut down the restaurant due to "monetary considerations." If Pizza Hut was slow in reacting to a dangerous situation in its restaurant because it believed it was contractually shielded from Liability by Norand, this would be precisely the type of problem the legislature was trying to alleviate in passing the statute.

Norand's [*8] motion to dismiss is granted.

Enter:

James B. Zagel

United States District Judge

Date JUN 17 1992

## CERTIFICATE OF SERVICE

To: All Counsel of Record

I hereby certify that on September 30, 2014, I electronically filed ***Scottsdale Insurance Company's Motion for Judgment Against Defaulted Defendant AAA-1 Masonry & Tuckpointing, Inc.*** with the United States District Court – Northern District of Illinois, Eastern Division by using the CM/ECF system.

/s/ Jonathan L. Schwartz

Jonathan L. Schwartz (ARDC #6287338)
Davis J. Kim (ARDC #6293122)
GOLDBERG SEGALLA LLP
311 South Wacker Drive, Suite 240
Chicago, IL 60606
312-872-5411 (phone)/312-572-8401 (fax)
jschwartz@goldbergsegalla.com
dkim@goldbergsegalla.com